<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    NEWPORT NEWS DIVISION


 3


 4  UNITED STATES OF AMERICA,   )
                                )
 5            Plaintiff,         )
                                )
 6  v.                          )      Criminal Action No.
                                )         4:23cr45
 7  DEJA NICOLE TAYLOR,         )
                                )
 8            Defendant.        )


 9


10                  TRANSCRIPT OF PROCEEDINGS

11                       (Sentencing)

12                  Newport News, Virginia
                     November 15, 2023
13


14  BEFORE:   THE HONORABLE MARK S. DAVIS
                United States District Judge
15


16


17  Appearances:

18        OFFICE OF THE UNITED STATES ATTORNEY
                By: Peter Osyf
19                  Lisa R. McKeel
                    Counsel for the United States
20
          CARLTON FIELDS, PA
21              By: Eugene J. Rossi
            -- and --
22        LAW OFFICE OF JAMES S. ELLENSON
                  By: James Stephen Ellenson
23                   Counsel for Defendant

24        The Defendant appearing in person.


25
</pre>

2

1            I N D E X

2  WITNESS ON BEHALF
   OF THE UNITED STATES:                      Page
3
   **RYAN NORRIS**
4  Direct Examination by Mr. Osyf..............    10

5  WITNESS ON BEHALF
   OF DEFENDANT:
6
   **CALVIN J. TAYLOR**
7  Direct Examination by Mr. Ellenson..........    47
   Cross-Examination by Ms. McKeel.............    55
8
   **Statement Of:**
9  Calvin Taylor...............................    60
   Abigail Zwerner.............................    65
10

11            E X H I B I T S

12  Government's Exhibit No.                    Received

13              1                                 17
               2                                 35
14              3                                 35
               4                                 35
15              5                                 35
               6                                 35
16              7                                 35
               8                                 35
17              9                                 35
              10                                 35
18             11                                 36
              12                                 45
19

20

21

22

23

24

25

1               P R O C E E D I N G S

2          (Commenced at 1:05 p.m. as follows:)

3          COURTROOM DEPUTY CLERK:  In Case No. 4:23cr45, the

4  United States of America v. Deja Nicole Taylor.

5          Mr. Osyf, is the government ready to proceed?

6          MR. OSYF:  The United States is ready, thank you, and

7  good afternoon, Your Honor.

8          THE COURT:  Good afternoon, Mr. Osyf.

9          COURTROOM DEPUTY CLERK:  Mr. Rossi, is the defendant

10  ready to proceed?

11          MR. ROSSI:  Yes, Your Honor, Gene Rossi with Mr.

12  Ellenson, and Ms. Taylor is here.

13          THE COURT:  All right.  Good afternoon to you,

14  Mr. Rossi.  And why don't we go ahead and have you or Mr.

15  Ellenson step to the -- or both of you -- step to the podium

16  with Ms. Taylor, and the clerk will administer the oath.

17          MR. ROSSI:  Thank you, Your Honor.

18          THE COURT:  And good afternoon to you, Ms. McKeel, as

19  well.

20          MS. McKEEL:  Good afternoon, Judge.

21          (Defendant placed under oath.)

22          THE COURT:  You all may be seated.

23          MR. ROSSI:  Thank Your Honor.

24          THE COURT:  Let's review some of the history of the

25  case that brings us here today.

1          On June 6th, 2023, this Court entered an order

2    authorizing a U.S. magistrate judge to conduct guilty plea

3    proceedings in the case, and on June 12th, Ms. Taylor requested

4    and consented to a magistrate judge conducting the guilty plea

5    proceedings.  On that same day, in accordance with a written

6    plea agreement, she appeared before United States Magistrate

7    Judge Douglas Miller and pled guilty to two counts of a criminal

8    information:  Count 1, unlawful user of controlled substance in

9    possession of a firearm, in violation of Title 18 of the United

10   States Code, Sections 922(g)(3) and 924(a)(8), and Count 2,

11   making a false statement during purchase of a firearm, in

12   violation of Title 18 of the United States Code, Sections

13   922(a)(6) and 924(a)(2).  Following the plea hearing, Judge

14   Miller issued a Report & Recommendation recommending that this

15   Court accept the guilty plea.

16          On June 27th, 2023, and in the absence of any

17   objections from the parties, this Court issued an order adopting

18   the Report & Recommendation accepting Ms. Taylor's guilty plea

19   and making the finding of guilt as to Counts 1 and 2.

20          The Court has received and reviewed the presentence

21   report that was prepared in this case, which I'm holding up here

22   now, and has carefully considered that presentence report dated

23   September 25, 2023, along with the addenda prepared on

24   November 1, 2023 and November 8 of 2023.

25          In addition to Ms. Taylor's sentencing memorandum,

1  which was filed as Document No. 29 on our electronic docket, and

2  the amended position paper submitted by the government, which is

3  No. 27, the Court has received and reviewed additional exhibits.

4  I want to review those with you so that we all know that we're

5  on the same page.

6          The Court has a letter from Cassandra Hanks and from

7  Calvin Taylor.  The Court has a victim impact statement from

8  A.Z. and has victim impact statements on behalf of K.S. and

9  M.G., all of which I have carefully read and considered prior to

10  coming into the courtroom today.

11          Those first two letters that I mentioned do not have

12  medical information in them that is not already in the

13  presentence report, and I don't see any reason to attach them to

14  the presentence report, but if you feel the need, I will do

15  that.  Any objection to them not being attached to the

16  presentence report that goes to the Bureau of Prisons,

17  Mr. Rossi?

18          MR. ROSSI:  No objection.

19          THE COURT:  All right.  And Mr. Osyf?

20          MR. OSYF:  No objection, Your Honor.

21          THE COURT:  All right.  Well, then at this time I

22  re-accept the guilty plea, I accept the plea agreement and

23  re-make the finding of guilt in this matter as to each of the

24  two counts.

25          Mr. Osyf, pursuant to the Statute, have all victims

1  been notified of the opportunity to attend the proceeding and to

2  make any statements they may wish?

3            MR. OSYF:  Yes, Your Honor, they have.

4            THE COURT:  Okay.  Thank you.

5            Now before we move on there was one small typo in the

6  presentence report in Subparagraph 8 of Paragraph 8.  It was in

7  the word "permitted", which was mistyped, and I'll hand-write

8  that.  That's on the bottom of Page 6.  Very last line.  And

9  I've corrected that and dated it.

10           It's the 15th, Madam Clerk?

11           COURTROOM DEPUTY CLERK:  Yes, sir.

12           THE COURT:  Okay.  All right.  Mr. Rossi and Mr.

13 Ellenson, have each of you reviewed the presentence report with

14 the addenda and did you have adequate time to review it with Ms.

15 Taylor?

16           MR. ROSSI:  Yes, Your Honor.

17           THE COURT:  And did you see any errors in the report?

18           MR. ROSSI:  No, Your Honor.

19           THE COURT:  All right.  Why don't we have Ms. Taylor

20 join you there at the podium?

21           And I can't see her behind that, so why don't you

22 switch sides and then move over?

23           MR. ROSSI:  Is that better, Your Honor?

24           THE COURT:  Mr. Ellenson you can join her there.

25           All right.  So Ms. Taylor, have you reviewed the

1  presentence report and the addenda?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Did you have enough time to review those

4  with your attorneys?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And did you see any errors in those

7  reports that you need to bring to my attention?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  All right.  While no presentence report is

10  going to be a 500-page biography of someone, this one of course

11  is some 18, 19 pages or so, and the intent is to capture the

12  relevant points that will assist the Court in making a decision

13  about the appropriate sentence.  And you've had a chance to read

14  the presentence report, you said.  Do you believe that the

15  presentence report fully covers your background?

16          THE DEFENDANT:  Yes.

17          THE COURT:  All right.  You all can have a seat.

18          MR. ROSSI:  Thank you, Your Honor.

19          THE COURT:  So there are no disputed issues, as I

20  understand it.  There were no objections in the presentence

21  report -- to the presentence report that have been noted, and

22  the only other thing we need to address is the violation report

23  of the defendant's pretrial bond.  This was presented to and

24  signed by U.S. Magistrate Judge Douglas Miller two days ago.  It

25  alleges report of positive drug test and admission of drug use,

1   and states that on September 28, October 3rd and October 16th,

2   Ms. Taylor submitted to random drug screens through the Phase

3   testing program that have returned positive for marijuana as

4   confirmed by Alere Toxicology Services.

5            As Ms. Taylor is scheduled for sentencing

6   November 14th, which was moved to today, the probation officer

7   preparing this recommended Ms. Taylor remain on bond so she may

8   continue receiving treatment services and continue to monitor

9   her drug use through Phase testing, and recommending that due to

10  her continued struggle with substance abuse, she not be granted

11  self-surrender if ordered to serve a period of incarceration.

12           That is the violation report that's before the Court.

13  And I'm happy to address that later, but it is before the Court,

14  and I wanted you all to know of it so that you had the

15  opportunity to address it at the appropriate time.

16           So with that having been done, the Court will adopt

17  the factual statements that are contained in the presentence

18  report as its findings of fact in this case.

19           Now let's talk about the statutory and guideline

20  sentencing recommendations and provisions.

21           So first, the statutory maximum punishment for Count 1

22  is 15 years of imprisonment and the statutory maximum punishment

23  for Count 2 is 10 years of imprisonment.

24           As for supervised release, both Counts 1 and 2 include

25  a period of supervision of not more than three years.  And so

1   this is the statutory punishment promulgated by the United

2   States Congress and the President.

3           Does the government agree that I've accurately stated

4   that?

5           MR. OSYF:  It does, Your Honor.

6           THE COURT:  Does the defense?

7           MR. ROSSI:  Yes, Your Honor.

8           THE COURT:  All right.  Now the Guidelines; that is,

9   the United States Sentencing Commission Guidelines promulgated

10   by the Sentencing Commission provides that application of the

11   advisory sentencing guidelines in this case results in an

12   offense level of 15 and a criminal history category of I, and

13   the resulting advisory guideline range is 18 to 24 months of

14   imprisonment.

15           Have I accurately stated, that Mr. Osyf?

16           MR. OSYF:  Yes, Your Honor.

17           THE COURT:  And Mr. Rossi?

18           MR. ROSSI:  Yes, Your Honor.

19           THE COURT:  Let's move on to any evidence that you may

20   have.  Does the government have any evidence it wishes to

21   present today?

22           MR. OSYF:  It does, Your Honor.

23           THE COURT:  All right.  You may present your evidence.

24           MR. OSYF:  Your Honor, the government calls Task Force

25   Officer Ryan Norris to testify.

1          THE COURT:  All right.  Officer Norris, please come up

2    so the oath can be administered.

3          RYAN NORRIS, having been duly sworn, was examined and

4    testified as follows:

5          MR. OSYF:  And Your Honor, as a point of procedure,

6    the Government has 12 exhibits.  There's a package on the bench

7    for you, Your Honor.

8               THE COURT:  Okay.

9          MR. OSYF:  I was intending to use the ELMO.  They have

10   all been properly redacted.  Is there any issue with having

11   them -- there's no jury, but I didn't know if they are published

12   immediately on the screens, if that's okay.

13         THE COURT:  They have been provided to the defense?

14         MR. OSYF:  They have.

15         THE COURT:  Is there any objection to any of them?

16         MR. ROSSI:  No, Your Honor.

17         THE COURT:  All right.  Then you can place them on

18   ELMO so that everyone can see.

19         MR. OSYF:  And Your Honor, if there's no objection,

20   would you like the government to move them all into evidence now

21   or wait until after we get --

22         THE COURT:  You can move them one at a time, I think.

23   That's probably the best way.

24                         DIRECT EXAMINATION

25   BY MR. OSYF:

1   Q.    Good afternoon.

2   A.    Good afternoon.

3   Q.    Would you please introduce yourself to the Court?

4   A.    My name's Ryan Norris.  I'm a Newport News police detective

5   assigned to the Bureau of Alcohol, Tobacco, Firearms &

6   Explosives Task Force.

7   Q.    So are you a police officer or are you with the ATF?

8   A.    Both.

9   Q.    Could you explain that?

10  A.    I'm assigned -- I'm a Newport News police detective, a

11  sworn Newport News police detective, and my assignment is

12  currently as a task force officer with the ATF, which means I'm

13  dually sworn.  I'm sworn under Newport News as well as ATF.

14  Q.    And for the purposes of this case, were you functioning as

15  a Newport News police detective or task force officer?

16  A.    As a ATF task force officer.

17  Q.    Okay.  And how long have you been a ATF task force officer?

18  A.    Since 2017.

19  Q.    And what types of cases have you typically worked in that

20  capacity?

21  A.    Typically work any cases that are within federal

22  violation -- firearms laws violations.  It could be anything

23  from violent crimes involving handguns, illegal purchases of

24  guns, drug distribution, things of that nature.

25  Q.    So how did you become involved with this case, the United

1   States v. Ms. Deja Taylor?

2   A.    So on January 6th of this year I responded to a call for a

3   shooting at Richneck Elementary School, which came out through a

4   Newport News page.  I responded to that location to assist on

5   behalf of ATF.

6   Q.    And what did you -- what role did you take when you arrived

7   on the scene?

8   A.    When I arrived on scene I made contact with the lead

9   investigators from Newport News, was advised that there was a

10  firearm that was present at the scene, so I assisted them with

11  trying to figure out the information for the firearm and to see

12  if we could do what in ATF was considered a trace, which

13  essentially is going to kind of tell us the lifestyle of that

14  firearm to figure out how that firearm ended up at this crime

15  scene.

16  Q.    Would you say that's standard procedure in a case involving

17  a firearm?

18  A.    Yes, sir, it is.

19  Q.    And did you conduct a trace in this case?

20  A.    Yes, sir, an emergency trace was conducted in this case.

21  Q.    Is there a difference between running a trace and an

22  emergency trace?

23  A.    Yes, sir.  Usually in more serious offenses, homicides,

24  shootings, where there's victims, and in this case we were

25  advised there was a victim, an emergency trace can be requested,

1   which expedites and kind of puts that information up above.  We

2   usually get that information back from the tracing center within

3   24 hours.

4   Q.   And what did you learn as a result of that emergency trace?

5   A.   In doing the emergency trace for this particular firearm,

6   I'm on scene, we learned that it was purchased from Winfrey

7   Firearms, which is a licensed federal firearms dealership --

8   dealer in York County, Virginia, and that it was purchased by

9   Deja Taylor.

10  Q.   And what's the significance of finding that original

11  purchaser?

12  A.   So typically in cases like this where we're trying to trace

13  firearms, we're trying to figure out the lifestyle of that

14  firearm, from how it got from the manufacturer to this crime

15  scene.  What a trace report is going to do is it'll give us the

16  information from date of manufacture to the date of its first --

17  when it he was first sold and who it was sold to.  That will

18  help us develop leads in case either that person was either

19  involved in this crime or if that person had maybe sold that

20  firearm or had that firearm stolen, and we can try to track down

21  how this firearm ended up at a particular crime.

22  Q.   Okay.  So once you learned that Ms. Taylor was the original

23  purchaser of the firearm, what did you do next?

24  A.   At that time I went to Winfrey Firearms and spoke with

25  management there and obtained a copy of the original Form 4473,

1  which is an ATF form that is filled out when you purchase a

2  firearm.

3  Q.   And just briefly, what is on a Form 4473?

4  A.   The purchaser's information, there's a series of questions

5  that need to be answered about the purchase of the firearm,

6  obviously the firearm's licensed dealership information, as well

7  as firearm information.  So make, model, serial number and

8  caliber.

9  Q.   I'm going to show you -- there should be a screen, I

10 believe?

11 A.   Yes, sir.

12 Q.   Government's Exhibit 1.  Do you recognize this document?

13 A.   Yes, sir.  This is a copy of the Form 4473 that I obtained

14 from Winfrey Firearms.

15 Q.   Okay.  So I just want to go through this.  This is -- and

16 again, what is the connection here with Ms. Taylor and this form

17 and the firearm?

18 A.   So this is showing that Ms. Taylor was the transferee or

19 purchaser of that firearm, and in the middle of the screen there

20 you can see that that is information that she had provided, her

21 information that she had provided.

22 Q.   And moving down the first page, starting in Block 21, I

23 don't know if you can read that or I can zoom in on it.

24 A.   I can read that.

25 Q.   Okay.  Can you go ahead and read it?

1  A.    Okay.  I'm sorry.  So Block 21 is asking to answer the

2  following questions by checking -- "Check or mark either Yes or

3  No to the right of the question."

4  Q.    And then it appears to be, one, two, three, four, five

5  questions on Page 1; is that correct?

6  A.    That is correct.

7  Q.    And six, seven, eight, nine, 10, 11, 12 on the top of the

8  next page; is that correct?

9  A.    That is correct.

10 Q.    And then after those 12 questions, what is the next block?

11 A.    That next block is all that language that's stating that

12 the person filling this form out had answered these questions

13 truthfully and accurately and that they are signing, and the

14 date that they filled and signed that form out.

15 Q.    Okay.  What is the purpose of these questions?

16 A.    So, to ensure that the licensed dealer that is selling that

17 firearm is not selling a firearm to somebody that may be

18 federally prohibited from possessing a firearm.

19 Q.    So is it safe to say that these questions are directly

20 correlated with prohibited status of individuals?

21 A.    Yes, sir.

22 Q.    And directing your attention to 21e, would you go ahead and

23 read that block for me?

24 A.    That block, the question asks "Are you an unlawful user of,

25 or addicted to, marijuana or any depressant, stimulant, narcotic

```
 1   drug or any other controlled substance?"  And then there is a
 2   warning to that question that "The use or possession of
 3   marijuana remains unlawful under Federal law regardless of
 4   whether it has been legalized or decriminalized for medical or
 5   recreational purposes in the state where you reside."
 6   Q.   And to the right of that block 21e there's a column with a
 7   box for Yes and a box for No.  Which is checked?
 8   A.   The box for No.
 9   Q.   And who would check that box?
10   A.   The person that is purchasing that firearm, and in this
11   case it would be Ms. Taylor.
12   Q.   Now, are there ever changes made to ATF Form 4473s?
13   A.   Yes, there's been some changes and edits to that form that
14   ATF has made.
15   Q.   So how would you know what type -- what time period of a
16   form you were dealing with?
17   A.   In the bottom right corner it has when that form was last
18   revised.  In this case in the bottom right corner it says that
19   this form was revised in May of 2020.
20   Q.   And do you know if the ATF Form 4473 has been revised since
21   2020?
22   A.   Yes, it has.
23   Q.   This is Government's Exhibit 2.  Do you recognize this
24   document?
25   A.   Yes.  This is the revised version of Form 4473.
```

1   Q.   And what is the revision date of this blank 4473?

2   A.   August of 2023.

3   Q.   And there's still a Box 21 that says answer those following

4   questions, and then a series of questions.  Are they all the

5   same as when Ms. Taylor filled hers out?

6   A.   They are all the same, and in this revision they actually

7   added an extra question.

8   Q.   And which question was that?

9   A.   It's going to be 21b.  "Do you intend to sell or otherwise

10  dispose of any firearm listed on this form and any continuation

11  sheets in furtherance of any felony or other offense punishable

12  by imprisonment for a term of more than one year, a federal

13  crime of terrorism, or a drug trafficking offense."

14  Q.   Is the box you read before that was previously 21e on Ms.

15  Taylor's form, is that question still verbatim on the new form?

16  A.   Yes, sir, it is.

17  Q.   And is that box 21f?

18  A.   You've got to slide it down a little bit.

19  Q.   There you go.

20  A.   Yes, sir.  That is correct.

21          MR. OSYF:  Your Honor, I'd like to move Government's

22  Exhibit 1 and 2 into evidence.

23          THE COURT:  All right.  They are admitted.

24                  (Government's Exhibits 1 and 2 admitted.)

25  BY MR. OSYF:

1   Q.   So after you obtained Ms. Taylor's 4473, what did that

2   prompt you to do next?

3   A.   Typically what we will do in any case where we're

4   investigating firearms and the original purchaser of the firearm

5   or anybody beyond that original purchaser, we start conducting

6   just basic background checks.  One is to ensure that the firearm

7   was purchased legally and in accordance with that form as well

8   as maybe any other possible associates or things related to that

9   purchaser that could help garner some leads towards how that

10  firearm, again, ended up at that crime.

11  Q.   And I apologize one second.  Going back to Government's

12  Exhibit 1 --

13  A.   Sure.

14  Q.   -- real quick.  Does it indicate on here the date Ms.

15  Taylor purchased the Taurus firearm?

16  A.   Yes.  July 19th, 2022.

17  Q.   Thank you.

18       Was the Taurus that's subject to Government's Exhibit 1,

19  was that the only firearm Ms. Taylor ever owned?

20  A.   No, it was not the only one she ever owned.  As the

21  investigation continued we learned there was another firearm

22  that she did own, but at the time of this incident it was

23  believed that the Taurus firearm was the only one that she

24  owned.

25  Q.   And tell us about that other firearm.

1    A.    So in doing some background in this we learned of an

2    incident in April of 2021 where Ms. Taylor was the occupant and

3    the driver of a vehicle during a traffic stop in Williamsburg,

4    Virginia.   During that traffic stop, there was a copious amount

5    of marijuana edibles and some other narcotics that were found

6    inside the vehicle with Ms. Taylor, her child's father, Malik

7    Ellison, another unidentified individual, and Deja's son, John

8    Doe.

9         During that interaction a question was asked of Ms. Taylor

10   whether there were any firearms in the vehicle, and she

11   indicated that there were no firearms in the vehicle but that

12   she did own a firearm, and it was at her residence.

13        Once we got a chance to speak to Ms. Taylor following the

14   January 6th, 2023 incident, she came in to Newport News Police

15   Department to speak to investigators there about the Richneck

16   school shooting, we went and spoke to her as well related to her

17   firearms purchase and we did ask about the High Point firearm

18   which she stated she did purchase I believe it was like six

19   months beforehand, February, maybe, 2022, I think was one of the

20   dates that she had given us, but that she had sold that firearm

21   in order to obtain the Taurus firearm.

22   Q.    Do you ever discover a 4473 for the High Point?

23   A.    No, we could not track down a 4473 for the High Point.

24   Q.    Why not?

25   A.    During the interview with Ms. Taylor she indicated that she

1  had purchased it at a gun show, she believed in either Norfolk

2  or Virginia Beach, she gave us an approximate time frame.  I

3  attempted to try and locate to see if we could figure out like

4  which gun show it was or which vendor she would have gone to,

5  but there are several gun shows throughout the years in this

6  area and hundreds of vendors and federal-firearms-licensed

7  dealers that go to these gun shows, so without having like

8  specific information on which vendor or licensed dealer she

9  purchased that firearm from, I could not pinpoint exactly when

10 she purchased or who she purchased that firearm from.

11 Q.   So no purchase documentation.  How about when she sold the

12 High Point?

13 A.   No.  So during her interview she stated that she did sell

14 the High Point firearm and she did have a bill of sale for it.

15 Obviously at that time, like we were at Newport News police

16 headquarters, she didn't have it on her person, but she did

17 indicate that she had a bill of sale for it.

18 Q.   And did you ever obtain a copy of that bill of sale?

19 A.   We never found or obtained a copy of that bill of sale.

20 Q.   You talked about an interview that you had with Ms. Taylor.

21 That was on January 13th, 2023?

22 A.   That is correct.

23 Q.   Had Ms. Taylor been interviewed by law enforcement prior to

24 that?

25 A.   She was interviewed by Newport News investigators that were

```
1   working the Richneck Elementary School shooting on the day of

2   the shooting, January 6th.  And then just prior to myself and my

3   partner interviewing Ms. Taylor on January 13th, she had come in

4   for an interview with, again, the Newport News police detectives

5   that were working the Richneck shooting.

6   Q.   Backing up one step, before you interviewed Ms. Taylor on

7   January 13th, did you conduct any investigation to help aid you

8   in the interview that followed?

9   A.   Yes, we did.

10  Q.   And what was that?

11  A.   So based off of some of the prior information that we

12  learned and specifically the Williamsburg traffic stop and the

13  amounts of marijuana and the indication that there was possible

14  marijuana use during the purchase of these firearms, with the

15  address and information on the 4473, coupled with information

16  that she had provided during the investigation of where she was

17  staying at, I conducted a, what we call a trash pull.

18       So essentially when trash is discarded on a public road for

19  pickup we will go in there, we will collect that trash and we'll

20  go through that trash to try to find any other evidence to

21  support whatever our theories were at the time, which at this

22  time was that this firearm was either purchased while a subject

23  was addicted to a controlled substance.

24  Q.   And is it fair to say that this investigative technique is

25  done in such a manner that there's no question as to the source
```

1   of the trash examined?

2   A.    Yes.

3   Q.    And what was the result of that trash pull?

4   A.    So the result was that, again, I found copious amounts of

5   evidence that related to marijuana use that included packaging

6   for marijuana edibles and marijuana seeds and stems, used and

7   burnt marijuana cigars, and some labels that were pretty

8   specific to some labels that were found on edibles during the

9   Williamsburg traffic stop back in 2021, in April of 2021.

10  Q.    So when you conducted the interview of Ms. Taylor on

11  January 13th, did you inquire about the evidence you seized

12  during the trash pull?

13  A.    Yes, we did.  We inquired about her marijuana use at the

14  time of the purchase of the firearms.

15  Q.    Okay.  And what was her response?

16  A.    So her response varied.  It changed several times

17  throughout the interview.  When we first started the interview

18  she was advised to be truthful.  As the interview continued on,

19  which it wasn't a very long interview, I don't remember exactly

20  how long, but it was a fairly short interview, she had to be

21  reminded about eight times that we were looking and trying to

22  obtain truthful information from her.

23        The reason she was reminded so many times is because her

24  statements about her marijuana use varied so much that,

25  initially she stated that once she became pregnant with her son

1   that she had stopped smoking marijuana, but then picked it back

2   up about a year later.

3       And then it changed again to that after the Williamsburg

4   traffic stop she had stopped smoking marijuana.

5       And then later on in the interview she admitted to having

6   maybe smoked marijuana at a party after the traffic stop.  And

7   then towards the end of the interview she had stated that she

8   had stopped smoking marijuana after the traffic stop up until

9   recently and because of the school shooting because she was

10  stressed out.

11  Q.   And during the course of that interview you testified

12  earlier that's when you learned about the High Point; is that

13  correct?

14  A.   That is correct.

15  Q.   Okay.  And did you learn about any specifics regarding the

16  purchase of the Taurus as well?

17  A.   Yes.

18  Q.   Okay.  Such as?

19  A.   Such as that during the High Point purchase she admitted

20  that when she filled that form out, which we didn't have a copy

21  of, that she was a user of marijuana when she filled that form

22  out; however, when she filled out the Form 4473 for the Taurus

23  which was recovered at Richneck, that she was not a marijuana

24  user.

25       Additionally, she had stated that she still had some ammo

1   and a barrel lock and a gun case for the Taurus purchase.

2   Q.   Get to the gun lock and -- or the gun box and the

3   trigger -- excuse me, the barrel lock in a second, but just

4   wanted to go back.

5        You were talking about -- or excuse me.  We'll go to the

6   barrel lock now.

7        So you said "barrel lock".  What is a barrel lock?

8   A.   So a barrel lock is typically, it's a device that usually

9   comes with the firearm when you purchase it.  Kind of looks like

10  a bike lock.  It's got a long cord on it.  That cord is designed

11  to slide through the barrel and through the extraction port on

12  the firearm and then lock so that firearm with cannot be fired,

13  won't allow that firearm to go into battery.

14  Q.   I'm showing you Government's Exhibit 3.  Do you recognize

15  what's depicted in these pictures in Government's Exhibit 3?

16  A.   This is typically what a barrel lock will look like.

17  Q.   To be clear, these firearms in these pictures have nothing

18  to do with this case; is that correct?

19  A.   Correct.  These are open-source pictures.

20  Q.   But these are depictions of what a barrel lock is?

21  A.   Yes, sir.

22  Q.   And it looks like they can be accessed by combination or

23  key; is that correct?

24  A.   That is correct.

25  Q.   And how are those barrel locks, how is that different from

1   a trigger lock?

2   A.   So a trigger lock is designed to go over the trigger guard

3   and the trigger itself of the firearm to prevent anybody from

4   being able to put their finger into the trigger guard and actual

5   the trigger.

6   Q.   Do trigger locks look anything like barrel locks?

7   A.   No.

8   Q.   Showing you Government's Exhibit 4.  What's depicted in

9   Government's Exhibit 4?

10  A.   That would be a trigger lock.

11  Q.   And again, none of the firearms or locks in this picture

12  are related to this case; is that correct?

13  A.   No.  These are open-source pictures.

14  Q.   And so during that interview, was Ms. Taylor specific about

15  what type of lock she was talking about?

16  A.   Yes, she was.  So to kind of give some context to it, we

17  had learned that the firearm and how that firearm ended up in

18  the hands of John Doe, that that firearm was secured and secured

19  by trigger lock.  So during our interview we asked specifically

20  about that.  And Ms. Taylor had stated that she did have a

21  barrel lock for her gun, and that after she purchased the

22  firearm, that she was provided by her father a trigger lock

23  which was -- again, she was very distinct about the two, and the

24  two are very different from each other -- and that that firearm

25  was secured by that trigger lock.

1  Q.    And we'll discuss a number of searches that were conducted

2  in a minute here, but were there any trigger locks found by law

3  enforcement in any of the subsequent searches related to this

4  case?

5  A.    No.

6  Q.    Were there any keys that might fit such a device?

7  A.    No.

8  Q.    Was there a barrel lock found?

9  A.    Yes.

10  Q.    Showing you Government's Exhibit 5.  What's depicted in

11  Government's Exhibit 5?

12  A.    That would be a barrel lock that was found in belongings

13  that -- Ms. Taylor's belongings during a search warrant that was

14  executed.

15  Q.    And do you recall where this barrel lock was found?

16  A.    It was located in the garage of the residence that she was

17  staying at in a bag of belongings that were removed from Ms.

18  Taylor's vehicle.

19  Q.    Showing you Government's Exhibit 6.  Is that -- does

20  that -- what's represented in Government's Exhibit 6, is that

21  how the barrel lock was initially found?

22  A.    Yes, sir.

23  Q.    You mentioned a gun box.  Was there a gun box discovered?

24  A.    No, there was no gun box that was found.

25  Q.    Talking about these searches that you've mentioned, was

1  there a search executed on January 19th, 2023?

2  A.    There was.

3  Q.    And where was that conducted?

4  A.    That was at the residence that we believe Ms. Taylor was

5  staying at.

6  Q.    And what was the result of that search?

7  A.    We recovered more evidence of marijuana use and consumption

8  in a room that Ms. Taylor was staying in, as well as the trigger

9  lock and some ammunition in those bags and belongings that you

10  just showed.

11  Q.    Was Ms. Taylor still staying at that residence?

12  A.    She was not, no, sir.  Upon execution of that search

13  warrant, we learned that she had moved and had been staying with

14  her mother shortly after the January 6th, 2023 Richneck

15  shooting.

16        THE COURT:  You just said in that room you found the

17  trigger lock -- that's what you said -- and ammo that was in

18  that bag.

19        MR. C.J. TAYLOR:  I'm sorry, the barrel lock and the

20  ammunition was found in that black bag and those belongings to

21  Ms. Taylor.

22        THE COURT:  All right.

23  BY MR. OSYF:

24  Q.    To be clear, was there ever a trigger lock discovered in

25  any search related to this case?

 1  A.    No.  No trigger lock was recovered.

 2  Q.    So when you learned that Ms. Taylor was no longer staying

 3  at that location, what did you do next?

 4  A.    So I learned that she was staying with her mother.  I

 5  received contact information for her mother and contacted her.

 6  I explained to Ms. Taylor's mom what was going on, the search

 7  warrant that we had executed, and also explained to her that I,

 8  I'm -- you know, was under the impression Ms. Taylor was staying

 9  with her and had left that residence with some belongings.  I

10  asked her if she would be willing to provide consent for us to

11  come to her apartment because we believed that there may have

12  been more evidence that she would have taken from the residence

13  that she was staying at to her mother's house.

14  Q.    And did her mother consent to that search?

15  A.    Eventually, yes, she did.  Shortly after that phone call I

16  was then contacted by Ms. Taylor's defense counsel, Mr.

17  Ellenson.

18  Q.    And so what happened at that point when you go to Ms.

19  Taylor's mother's residence?

20  A.    So I arranged to meet Mr. Ellenson, Ms. Taylor and her

21  mother at the residence, spoke with them, advised Mr. Ellenson

22  the nature of our investigation and what we had had, and

23  obtained consent to search the room that Ms. Taylor was staying

24  in at her mother's residence, as well as a purse that Ms. Taylor

25  was in possession of at the time we made contact, and Ms.

1    Taylor's cellphone.

2    Q.    And was there anything obtained of any evidentiary value

3    from the location where Ms. Taylor was staying at her mother's

4    house and her purse?

5    A.    Yes.  So in the room that she was staying at there was more

6    marijuana, there was a fairly-decent-sized bag of marijuana that

7    was recovered from that room, as well as indication of marijuana

8    use and consumption, and additionally in her purse there was

9    more marijuana packaging material that was consistent with

10   commercialized, like, marijuana that comes from California for

11   edibles or actual marijuana, and in one of those packages there

12   was copious amounts of burnt marijuana cigars that were inside

13   of it.

14   Q.    Did you ever discuss Ms. Taylor's substance use with any

15   other individuals during these searches?

16   A.    Say that one more time?

17   Q.    So I'll rephrase that.

18         Going back to that first search, who -- how about this:

19   Whose residence was that first search on January 19th?

20   A.    It was her grandfather's.

21   Q.    Okay.  And at any time did you discuss Ms. Taylor's

22   substance use with Ms. Taylor's grandfather?

23   A.    Yes.

24   Q.    And what was, what was the nature of -- or the extent

25   expressed to you of her use?

1  A.   That it was fairly consistent; that it was common for her

2  to come home smelling like marijuana, not that it was typically

3  done in the house, but it was definitely done in the vehicle she

4  operated where the belongings came out of, and that it was

5  recent.

6  Q.   And did you have a similar conversation when you went to

7  Ms. Taylor's mother's residence with Ms. Taylor's mother?

8  A.   Yes.

9  Q.   And what was the result of that?

10  A.   The same results:  That her marijuana use was fairly

11  frequent and prolonged.

12  Q.   Any discussion about when it started?

13  A.   11 years, up to the most recent October 16th.  She had been

14  using since she was a teenager up to, you know, her young adult

15  age.

16  Q.   And you mentioned that there was, in addition to consent

17  that was given to search her area, living area at her mother's

18  place, Ms. Taylor also gave consent to search her purse.  You

19  also mentioned a phone; is that correct?

20  A.   That is correct.

21  Q.   And was anything of evidentiary value found on Ms. Taylor's

22  phone?

23  A.   Yes.  And that would have been more information

24  corroborating her consistent and prolonged use of marijuana.

25  Q.   In addition to corroborating her substance use, was there

```
 1  anything else that you discovered on the phone that was of
 2  interest?
 3  A.    There was.
 4  Q.    What was that?
 5  A.    There were an incident, a shooting incident that involved a
 6  you U-Haul truck and Ms. Taylor's child's father, Mr. Malik
 7  Ellison.
 8  Q.    We'll get to those texts in a second.  But as a result of
 9  that, what did you do next?
10  A.    So I looked into the time frame that -- that incident,
11  looking at the text messages, occurred sometime on December 27th
12  of 2022.  I tried to obtain or looked to see if there were any
13  police reports for any shootings.  Once we discovered that there
14  was a U-Haul, we learned of more information, voicemails that
15  were left by the U-Haul company of return of a U-Haul, so I
16  requested a subpoena for rental information.  We learned that
17  the U-Haul company that she rented from was located on J. Clyde
18  Morris Boulevard, so we issued a subpoena to them to obtain the
19  contract information related to that.
20  Q.    And did you receive a return from U-Haul?
21  A.    Yes, we did.
22  Q.    I'm showing Government's Exhibit 7.  Do you recognize this
23  document?
24  A.    Yes.  This is one of the documents I obtained from U-Haul
25  pursuant to that subpoena.
```

1  Q.    And what did you learn from this document?

2  A.    So this is the initial contract and monies paid, and that

3  this contract was implemented on December 23rd of 2022.

4  Q.    And in addition to receiving the initial contract, I'm

5  showing you Government's Exhibit 8.  Was this also in the U-Haul

6  return?

7  A.    Yes, it was.

8  Q.    And this is a several-page document.  Excuse me.

9        One, two, three, four, five-page document.  What is on this

10  document?

11  A.    This is the contract, sir.  So it has Ms. Taylor's license

12  information, payment information, promissory note and the cost

13  of that.  And then in the subsequent pages when the U-Haul was

14  scheduled to be returned, and it wasn't, the attempts to contact

15  Ms. Taylor in order to return the U-Haul.

16  Q.    So you had -- looking at Government's Exhibit 7, the

17  initial truck rental was on December 23rd, 2022; is that

18  correct?

19  A.    That is correct.

20  Q.    And that's indicated in Government's Exhibit 8; is that

21  correct?

22  A.    Yes.

23  Q.    And then as we go up the list it looks like subsequent

24  notes.  Are these notes from a U-Haul representative?

25  A.    Yes.

1   Q.   As we go up, the dates, dates and times on the left-hand

2   column all on 12/23, I know you're not a representative of

3   U-Haul, but there doesn't appear to be anything unusual at that

4   point on 12/23 happening; is that correct?

5   A.   That is correct.

6   Q.   We get up to 12/26, what is the notation there?

7   A.   That U-Haul attempted to call Ms. Taylor and that there was

8   no answer.

9   Q.   And above that at 3:32 on 12/26?

10  A.   The same thing:  Called again and no answer.

11  Q.   How about on 12/27?

12  A.   It indicates that they called the first number and left a

13  message about returning the van, and left a contact phone

14  number, and then they called a second number and left a message

15  as well.

16  Q.   As we go up there's several more calls left.  When we get

17  to --

18          MR. ROSSI:  Your Honor, to make things move along, we

19  don't dispute that U-Haul was rented on the 23rd and it was

20  returned, I think, in January.  We don't dispute any of that.

21  We concede everything that he will say.

22          MR. OSYF:  I'll move on, Your Honor.

23          THE COURT:  It appears the government wishes to ask

24  further questions, Mr. Rossi.  Thank you for the concession.

25          MR. ROSSI:  Thank you, Judge.

1  BY MR. OSYF:

2  Q.   I will forego going through the list and turn to the last

3  page of the Late/Not Returned U-Haul Rental Equipment.  And what

4  is this?

5  A.   This is what was explained to me as a demand letter, and it

6  is a letter that is sent out by U-Haul when a piece of

7  equipment, a van, a trailer or whatever, is not returned when

8  it's scheduled to be returned, and after several attempts they

9  will send this letter to the renter explaining to them that they

10  need to return their vehicle, and that if they don't, that they

11  will proceed with criminal violations.

12  Q.   Did Ms. Taylor ever return the U-Haul?

13  A.   No, it was not returned by Ms. Taylor.

14  Q.   When did -- was it -- not by Ms. Taylor.  Was it returned

15  at all?

16  A.   Yes.  It eventually was recovered at a location in Newport

17  News.  I believe U-Haul got contacted that this vehicle was

18  found abandoned, inoperable with no keys and a busted-out

19  window, so U-Haul contacted a wrecker service, a towing service

20  to collect the U-Haul, fixed the broken windows and made repairs

21  that need to be repaired, and returned it to U-Haul.

22  Q.   Do you receive that as well?

23  A.   I did.

24  Q.   And so Government's Exhibit 10, was that a return from the

25  automotive service?

1  A.    Yes, sir.

2  Q.    And again, you just went through it, but on the second

3  page, the Impound Summary, there is some notations.  Could you

4  read that, please?

5  A.    The one note there that you just pointed to was that the

6  passenger rear door glass was broken.

7  Q.    And then down below in the box for Vehicle Summary there's

8  Drivable and Keys.  What are the notations there?

9  A.    That it was not drivable and that there were no keys.

10  Q.    Going back to --

11          THE COURT:  So before I forget, are you --

12          Madam Clerk, what's been admitted so far?  What number

13  are we up to?

14          COURTROOM DEPUTY CLERK:  Exhibits 1 and 2 have been

15  admitted.

16          THE COURT:  Just 1 and 2.

17          MR. OSYF:  So Your Honor, if I may, the Government

18  would like to move into evidence Exhibits 3, 4, 5, 6, 7, 8, 9

19  and 10.

20          THE COURT:  Okay.  Those are admitted.  No. 8 is

21  admitted subject to you redacting the Master Card numbers that

22  are listed there.

23                  (Government's Exhibits 3-10 admitted.)

24          MR. OSYF:  My apologies.

25          Before we get to the texts, and Your Honor, this is

1   more for the Court, Government's Exhibit 11, just wanted to take

2   judicial notice, the format that the texts are in, they're all

3   time-stamped with UTC.

4            MR. ROSSI:  I'm sorry.  Your Honor, on Exhibit 7 could

5   we also have an additional redaction?  Ms. Taylor's home address

6   is on there.  It's redacted on 8 but it is not redacted on 7.

7   We'd ask that it be redacted.

8            THE COURT:  Yes.

9            MR. OSYF:  Absolutely, Your Honor.  We will do that.

10            MR. ROSSI:  Thank you, Your Honor.

11   BY MR. OSYF:

12   Q.   Government's Exhibit 11 is just printed off from the

13   National Institute of Standards and Technology indicating

14   Eastern Standard Time is UTC-5.

15            THE COURT:  All right.  The Court will take judicial

16   notice of it based on the Exhibit 11 information.

17            MR. OSYF:  And we'd like to admit Exhibit 11.

18            THE COURT:  Admitted.

19                 (Government's Exhibit 11 admitted.)

20   BY MR. OSYF:

21   Q.   So turning to Government's Exhibit 12, Task Force Officer

22   Ryan, do you recognize this document?

23   A.   Yes.  This is a report from the cellphone extraction of Ms.

24   Taylor's phone.

25   Q.   And is this the report in its entirety?

1  A.    No, this is a small portion of that report.

2  Q.    Okay.  And what does this excerpt pertain to?

3  A.    This is a conversation between Ms. Taylor and her child's

4  father, Malik Ellison.

5  Q.    Is it fair to say that what's embodied in Government's

6  Exhibit 12 is what drew you to investigate the U-Haul incident?

7  A.    Yes, sir.

8  Q.    So again, I'm not going to go through even this entire

9  excerpt, but you said that this is between two individuals, Ms.

10 Taylor and John Doe's father; is that correct?

11 A.    That is correct.

12 Q.    So it appears to be set up -- Government's Exhibit 12

13 appears to be set up as a text message screen might appear, with

14 green on one side and blue on the other?

15 A.    Correct.

16 Q.    Can you tell us who is green and who is blue?

17 A.    The green would be the phone that's being extracted, so

18 that would be messages coming from that device, and the blue

19 would be the respondent, whoever those messages were going out

20 to.  So in this case the right would be Ms. Taylor in green and

21 the left would be John Doe's father in blue.

22 Q.    So on Page 4 of Government's Exhibit 12, at the top the

23 first green block, could you read that?

24 A.    Yes.  "And ur not gonna be here I don't have a car the hal

25 is over there."

1  Q.   And as it will be repeated in later texts, did you

2  understand what "hal" was at that point?

3  A.   Along with the other texts, that that was related to the

4  U-Haul?

5  Q.   Turning to Page 7 of Government's Exhibit 10, middle of the

6  page in the green box, could you read that?

7  A.   Yes.  So that message says "Because why I wake up and can't

8  see yo shit plus u ain't take the shit back.  Don't worry I'm

9  about to come so you can take it back now."

10 Q.   And do you know what, based on the rest of that

11 conversation, what Ms. Taylor's referencing there?

12 A.   So, yes, this started to be a reference towards the

13 returning of the U-Haul.

14 Q.   And on Page 8, if you could read that first green block?

15 A.   "U need to drop it off now and I'm taking u home I been

16 told u to take it back they keep calling me."

17 Q.   And the next green block on that same page?

18 A.   You've got to slide it up a little bit, please.

19 Q.   Sorry.

20 A.   "I said as soon as ur mom got off take it back."

21 Q.   And is this still referring to the U-Haul?

22 A.   Yes.

23 Q.   And at the top of Page 9, the blue box, which is John Doe's

24 father; is that correct?

25 A.   That is correct.

```
1    Q.    And what does he say?

2    A.    Asking if "they calling you now."

3    Q.    And Ms. Taylor's response?

4    A.    "I'm not going to jail over u keeping a uHal."

5    Q.    Her next text?

6    A.    "They have called 6 times and u not by yo self."

7    Q.    And is that corroborated by the earlier government exhibits

8    from the U-Haul records?

9    A.    Yes.  The dates of the call -- or the dates of the records

10   as well as the call are these texts which were on December 27th

11   of 2022.

12   Q.    Page 10 of Government's Exhibit 12, the bottom green block,

13   would you please read that?

14   A.    "U grown and it's in my name."

15   Q.    And the green block on Page 11?

16   A.    They gone fuck around and send a sheriff to get it."

17              THE COURT:  You can just say "F".

18              MR. C.J. TAYLOR:  Yes, sir.

19   BY MR. OSYF:

20   Q.    On Page 12 of Government's Exhibit 12, on the left-hand

21   side, the top blue column, could you read that?

22   A.    Yes.  It says "They're closed right now."

23   Q.    And the next two blue blocks?

24   A.    "I'm going down town."

25         "I'll be back."
```

1  Q.    And the top green block on Page 13?

2  A.    "That don't matter bring that s to my house now.  Or I'll

3  come get just u."

4  Q.    Moving along to Page 17 of Government's Exhibit 12, the

5  green block on the right?

6  A.    "Move the van behind the truck at the end."

7  Q.    And the blue block response?

8  A.    "Y".

9  Q.    And Ms. Taylor's response?

10 A.    "U shouldn't have called her I told u I would stop when the

11 bitch got out the car."

12 Q.    And on to Page 18 at the top, Ms. Taylor's next text?

13 A.    "Just move it".

14 Q.    And John Doe's father, you said his name is Malik; is that

15 correct?

16 A.    Yes, sir.

17 Q.    So Malik then responded?

18 A.    "What's wrong".

19 Q.    And Deja?  Ms. Taylor?

20 A.    Ms. Taylor's response was "Everything.  Put the truck at

21 the end."

22       "I can't use the car anymore."

23 Q.    On Page 19?

24 A.    This is Ms. Taylor saying "This is why I said don't play

25 with me.  I'm you."

1   Q.   And Malik's response?

2   A.   "Bro wtf", which is an acronym for "What The F".

3   Q.   And after that?

4   A.   "I already told you nothing happened."

5   Q.   And Ms. Taylor's response?

6   A.   "I don't care u don't want me with nobody I don't want u

7   with nobody.  U said you was making a play not taking to a

8   bitch."

9   Q.   Going on to Page 20.  What does Malik write on that blue

10  block on Page 20?

11  A.   So this was the message that initially kind of caught my

12  eye when I was going through the cell phone download, and that

13  message is from Malik to Ms. Taylor.  It said "Yo, u kouldve

14  killed me."

15  Q.   And her response?

16  A.   "And who u were with."

17       "I was never going to hurt u."

18  Q.   Page 21, the second green block down?

19  A.   This is from Ms. Taylor to Malik stating "Location needs to

20  be on all the time.  U ran from me with a bitch in the uHal

21  that's in my name.  I told u if I saw a bitch I was going to up

22  that shit.  U was gonna hit me for finding y'all and that's why

23  I really was upset.  How u gone walk up on me but not let the

24  bitch out.  The bitch that want u."

25  Q.   At the top of Page 24 can you read Ms. Taylor's text?

1  A.   Ms. Taylor's text reads "U risking somebody life knowing

2  I'm not stable."

3  Q.   Moving on to Page 27, Ms. Taylor's text at the bottom of

4  Page 27?

5  A.   That text message from Ms. Taylor states "U better not

6  leave yo was gonna call the police on me.  I wasn't going to

7  hurt u."

8  Q.   The next page, the top of 28, what does Malik say?

9  A.   "Bro... u almost shot me deja."

10       "The bullet is above my head."

11 Q.   What does she say?

12 A.   Ms. Taylor's response was "U kept moving the van.  I was

13 aiming at the hoe".

14 Q.   The top of Page 30, what does Ms. Taylor say?

15 A.   "Drugs help fill a void and when u are not around the

16 voices take over".

17 Q.   Moving on to Page 39 of Government's Exhibit 12, the middle

18 green block reads?

19 A.   "This bitch is my example don't make me have to pop all of

20 them.  This shit stops right here."

21 Q.   Moving on to Page 48 of Government's Exhibit 12?

22 A.   Ms. Taylor sends a text that states "U want to leave

23 because I saw what I saw.  It's okay now though I'm good if u

24 good".

25 Q.   And to be clear, all these texts are taking place on

1   December 27th, 2022; is that correct?

2   A.   Yes, sir.

3   Q.   The next text reads?

4   A.   "U said u was asleep and I see u tryna duck off with a

5   bitch in the van."

6   Q.   On 49 Malik writes?

7   A.   "Leave me alone".

8   Q.   And Ms. Taylor responds?

9   A.   "Bye."

10  Q.   Page 50, second block down Malik writes?

11  A.   "U almost killed me and u still talking about the bitch".

12  Q.   Finally moving to Page 69 of Government's Exhibit 12.

13  A.   Ms. Taylor sends a message stating "I did something and I

14  had to look back thru our messages to see."

15       "Don't have a clear memory of anything so I'm going with

16  what ur saying."

17  Q.   And on Page 70 Ms. Taylor writes?

18  A.   "It was not meant for u.  Deja tried to stop.  Tried to

19  calm down.  Tried to think.  But I just couldn't".

20  Q.   And I'm sorry, going back up to the top of the page, what

21  does Malik write?

22  A.   Prior to that message I just read Malik sends a message

23  stating "You talking bout if I won't in the car with her... bruh

24  so if you took my head then u was gonna say the same shit."

25       "I told you to stop that you was doing to much.  I told you

1  meet me at my house."

2      "It's krazy you literally almost killed me.  Not her.  And

3  you worried about her still".

4  Q.   And on Page 72?

5  A.   So she states, Ms. Taylor states, "I'm crazy I'm not

6  stupid."

7  Q.   And the next message?

8  A.   "It's cool I get it.  Make everything my fault hell u might

9  as well have just called the police.  They would've took me

10  where I needed to be."

11        MR. OSYF:  One second, with the Court's indulgence.

12  BY MR. OSYF:

13  Q.   Going back, sorry, back to Page 22 of Government's

14  Exhibit 12, what's the bottom line or bottom box from Malik

15  read?

16  A.   Sure.  So this is still during the U-Haul incident on

17  December 27th of 2022, this is just preceding the messages how

18  Ms. Taylor shot at Malik, Malik sends a message, "We can't drop

19  this shit off anymore".

20  Q.   And at the top of Page 23?

21  A.   "I gotta wipe it down and find the casing".

22  Q.   And what do you understand that to mean?

23  A.   That "the casing" is in reference to the bullet casing

24  fired from the gun, and that they were going to wipe down the

25  van for any type of evidence if the van is recovered that law

1  enforcement would be able to collect.

2  Q.   And Ms. Taylor's response to that?

3  A.   "I will finish my shit.  Well we will do that and I'll wear

4  gloves and have somebody take me to leave it somewhere nana is

5  only upset because of what she heard u should've hung up.  She

6  couldn't stop me. "

7  Q.   And being respectful in the recitation of the following

8  block, could you read that, please?

9  A.   "I'm done" --

10         THE COURT:  Just use -- if there's a reference to the

11  N word, you can just use "N".

12         MR. C.J. TAYLOR:  Yes, sir.

13  A.   "I'm done Ns gone handle that shit u have to be here for my

14  son.  If u so much as call that bitch that's her whole family."

15  Q.   Thank you.

16         MR. OSYF:  Your Honor, the government moves to admit

17  Government's Exhibit 12 into evidence.

18         THE COURT:  It's admitted.

19              (Government's Exhibit 12 admitted.)

20  BY MR. OSYF:

21  Q.   Task Force Officer Norris, is there any indication

22  throughout this entire investigation that Ms. Taylor's

23  controlled substance use has been anything less than consistent

24  and prolonged?

25  A.   No, there has not.

1             MR. OSYF:  No further questions for Task Force Officer

2    Norris.

3             THE COURT:  All right.  Mr. Rossi, Mr. Ellenson, do

4    you have any questions?

5             MR. ROSSI:  No questions, Your Honor.

6             THE COURT:  All right.  May this witness step down?

7             MR. OSYF:  Yes, Your Honor.

8             THE COURT:  And be excused?

9             MR. ROSSI:  Yes, Your Honor.

10            THE COURT:  All right.  You're excused, sir.

11            MR. C.J. TAYLOR:  Thank you, Your Honor.

12            MR. OSYF:  Your Honor, the government does not have

13   any more witnesses, however, one of the authors of the impact

14   statement, Ms. A.Z., is present in the court today, she has

15   represented that she would like to read her statement aloud to

16   the Court if the Court deemed that appropriate.

17            THE COURT:  All right.  Is the defense going to have

18   any evidence today?

19            MR. ROSSI:  No, Your Honor.

20            THE COURT:  All right.

21            MR. ROSSI:  Hold on, Your Honor.  We will have a

22   statement from Mr. Calvin Taylor.

23            THE COURT:  Okay.  So --

24            MR. ROSSI:  And Your Honor, I wanted to bring up, when

25   you listed the letters that you have, unless my ear wasn't

```
 1  working right, does Your Honor have a letter from Calvin Taylor?

 2            THE COURT:  Yes.  I said two.

 3            MR. ROSSI:  I misheard.  I'm so sorry.

 4            THE COURT:  The grandfather and the mother's letter.

 5            MR. ROSSI:  Yes.  Yes.

 6            THE COURT:  Yep.  I've read those.

 7            So I think we're going to need to take a break at some

 8  point, and it may be best to do it now rather than later.  So

 9  let's take a 10-minute break and then come back.

10            MR. ROSSI:  Thank Your Honor.

11            (Recess taken from 2:14 p.m. to 2:25 p.m.)

12            THE COURT:  Mr. Ellenson, are you ready to proceed?

13            MR. ELLENSON:  Judge, yes, sir.  We would like to call

14  Calvin Taylor as a witness.

15            THE COURT:  All right.  Mr. Taylor, would you come

16  forward so the oath can be administered?

17            CALVIN J. TAYLOR, having been duly sworn, was examined

18  and testified as follows:

19            THE COURT:  You may proceed.

20                        DIRECT EXAMINATION

21  BY MR. ELLENSON:

22  Q.   Please state your name, sir.

23  A.   Yes, sir.  My name is Calvin J. Taylor.

24  Q.   And are you retired now?

25  A.   Yes, sir.
```

1   Q.   What did you used to do?

2   A.   Well, sir, I retired from the United States Army, 22 years,

3   military police drill sergeant, and also retired from the

4   Department of Corrections as a captain.

5   Q.   Okay.  How long did you work for DOC?

6   A.   Twenty years.

7   Q.   Now, you're Deja's grandfather?

8   A.   Yes, sir.

9   Q.   When did Malik Ellison come into Deja's life?

10  A.   Well, sir, I think they, they met while they were in a

11  alternative school, high school.

12  Q.   How old were they?

13  A.   I guess I would have to say middle 2000s.

14  Q.   Okay.

15  A.   They were young.  They were teenagers.

16  Q.   Now, 14, 15 you're talking about?

17  A.   Yes, sir.

18  Q.   And you pretty much raised Deja; is that right?

19  A.   Pretty much.  She was at our house a whole lot.

20  Q.   And did you approve of the relationship between him and

21  her?  Malik?

22  A.   Well, sir, the relationship, you know, whether I approved

23  it or not, it just seemed a little bit volatile.  It seemed like

24  a lot of arguing back and forth.  I didn't know of any

25  physicality at the time, but I know now.

```
 1  Q.   And you told the police, law enforcement right when this
 2  case started that you know that Deja smokes a whole lot of
 3  marijuana and that she's been doing so for a long time?
 4  A.   Well, sir, I didn't tell them that, I told them that I
 5  couldn't prove she smoked it, but she smelled of it a lot.
 6  Q.   Okay.  Fair enough.
 7       So you have custody of this child right now; is that
 8  correct?
 9  A.   Yes, sir.
10  Q.   And since the incident at -- since the shooting at
11  Richneck, you have been present for many, many counseling
12  sessions?
13  A.   Yes, sir.  From occupational therapy, recreational therapy,
14  trauma therapy, anger management, intensive in-home therapy
15  sessions, psychiatric appointments, you name it, we got it.  We
16  have one this afternoon.
17  Q.   Okay.  You have been awarded custody of this child by
18  Newport News Juvenile Court; is that correct?
19  A.   Yes, sir.
20  Q.   Okay.  And if anyone sees the child, either Deja or Malik,
21  you have to be present; is that correct?
22  A.   Yes, sir.
23  Q.   Okay.
24  A.   It has to be supervised.
25  Q.   Yes, sir.  In the months prior to your getting custody, if
```

1    either Deja or Malik took the child out of your home, was there

2    anything you could do about it?

3    A.    No, sir.  You know, prior to me being awarded custody there

4    was a lot of speculation, especially from, you know,

5    psychiatrists, parent/child interaction, things we had to go

6    through, the parenting classes, and the consensus was they

7    wanted me to explain where they were, explain when they left the

8    home, where they would be, whether they were going from hotel to

9    hotel, sleeping in cars or living some other place.  I could

10   only speculate that.  I could tell you what the child told me,

11   but I couldn't say for sure where exactly he was.  But I do know

12   from being in those therapy sessions, you know, a lot of, a lot

13   of the places that that young man said that they were at, they

14   pretty much were at those places.

15   Q.    All right.  Did the child for the most part live with you

16   for a number of years?

17   A.    Yes, sir.  For the most part in and out, off and on.

18   Q.    Let's just briefly, from around September -- the beginning

19   of the school year, September of 2022, where was the child's

20   residence?

21   A.    It was at my residence.  It was pretty consistent then.

22   Q.    Okay.  And your residence is the one that's listed with

23   the -- was listed with the Newport News school system?

24   A.    Yes, sir.

25   Q.    As his home address?

1   A.    Yes, sir.

2   Q.    And during that first semester was there a plan -- how

3   did -- did the child go to school by himself or did one of you

4   all have to be with him, or what was it?

5   A.    Well, sir, when school first started he went by himself but

6   he displayed a number of behavioral issues, so the school

7   determined -- it wasn't a official plan put in place, it

8   definitely wasn't a IEP plan put in place, which called for an

9   adult to be present with him for a couple hours.  They put him

10  on a modified schedule.  I attended at least two or three

11  in-class sessions where I have stood in the back of the

12  classroom and tried to encourage him to behave well.

13        But also what needs to be noted is, prior to him getting

14  seen by a doctor to assess, you know, maybe if there was some

15  behavior issues, and the School Board, the school got involved

16  in that as well too.  Because the same questionnaire that I had

17  to submit back to the doctor, also someone at the school had to

18  submit that same questionnaire back.  And I have a copy of it

19  now as well.

20  Q.    Has he got -- he's got a IEP now?  Or where are we at on

21  that?

22  A.    With a lot of pushing he has a IEP now, sir.

23  Q.    Okay.  And so during that first semester who would go to

24  the school with him after it was determined that a parent or an

25  adult had to go to school with him?

1   A.   His mother would, sir.

2   Q.   Anybody else?

3   A.   Occasionally his father would go.  I know my granddaughter,

4   she went a couple times as well.

5   Q.   Her sister?

6   A.   Yes.

7   Q.   Okay.  And did everyone have your phone number?

8   A.   Yes, sir.  There was times when -- I had a part-time job.

9   I got several calls because either he didn't get picked up on

10  time or he was acting up.  I would leave because no one else

11  would answer the phone.  I would leave my part-time job and go

12  get him.  So there were a whole bunch of times that I got

13  called.  I didn't get a call January 6th though.

14  Q.   You did not?

15  A.   No, sir.

16  Q.   Had you dropped him off at school that day?

17  A.   Yes, sir.

18       (Defense counsel conferred.)

19  BY MR. ELLENSON:

20  Q.   Do you know why -- okay.  You said first semester there was

21  an adult family member present with that child every day at

22  school?

23  A.   Yes, sir.  I believe it started somewhere in the middle or

24  at the end of September.

25  Q.   Why did it?

1    A.    Why did it?

2    Q.    Why did it stop?

3    A.    It stopped because his behavior, once he got at a position

4    or condition where he was more even-keeled, in my opinion, his

5    behavior was indicative to someone being placed in an

6    environment that he had never been in.  The two years that he

7    should have been in a formal educational setting, it got cut

8    short by COVID, then his attendance for whatever reason didn't

9    keep up.  And then the following year he started -- some brain

10   surgeon decided to send him back to school down to a

11   kindergarten setting, and I think it was a misunderstanding

12   whether or not he was going to continue that or move to another

13   state.  So that whole second year that he should have been in a

14   formal setting, he was not.

15   Q.    So he never actually finished either pre-K or kindergarten;

16   is that correct?

17   A.    54 days, sir.

18   Q.    Of both pre-K and kindergarten combined?

19   A.    Yes, sir.

20   Q.    And the school nevertheless just put him right into first

21   grade --

22   A.    Yes, sir.

23   Q.    -- at Richneck Elementary?

24   A.    Yes, sir.

25   Q.    Okay.  Do you know why -- up through Christmas break of

1   2022, one of you all was always present; is that right?

2   A.   Yes, sir.  Up until I think it may have been the first day

3   back after Christmas break.

4   Q.   And then, what, the principal, assistant principal,

5   teacher, I mean, who decided that none of you needed to come

6   back anymore?

7   A.   Sir, I'm assuming it was the assistant principal.  I can't

8   say for sure.  I can only speculate.  But I wasn't always

9   present at their decision-making things because I was not a

10  custodial parent.  I spent some time talking to the assistant

11  principal, and I'm sorry she lost her job, but I think her

12  endgame was to try to get these kids to stay in school instead

13  of being pushed out somewhere else.

14  Q.   Okay.  Just to reiterate, right now the child is -- you

15  have the child, the child is doing as well as can be expected at

16  this point?

17  A.   Yes, sir.  He's doing wonderful.  He's in a different

18  environment.  He's happy to go to school.  He's learning things.

19  He's surprises himself.  Last week he was star student of the

20  week.  It's just amazing what a different environment will do.

21  Q.   He loves his mom?

22  A.   Yes, sir, he loves his mom and dad.  But he understands

23  there's some things that they have to work out in order for them

24  to be full-time participants in his well-being.

25          MR. ELLENSON:  I don't have anything else, Judge.

 1                THE COURT:  Ms. McKeel?

 2                MS. McKEEL:  Thank you, Judge.

 3                         CROSS-EXAMINATION

 4    BY MS. McKEEL:

 5    Q.    Good afternoon, Mr. Taylor.

 6    A.    Good afternoon, ma'am.

 7    Q.    You've talked a little bit and told the Court a little bit

 8    about your great-grandson; is that right?

 9    A.    Yes, ma'am.

10    Q.    Before the school shooting, January 6th of 2023, were you

11    aware of two incidents in which CPS investigated because -- and

12    we're calling him John Doe -- took his mother's car keys and got

13    into a -- got into the vehicle?

14    A.    Yes, ma'am.

15    Q.    Okay.  And with those two incidents, did an accident occur

16    in at least one of those incidents where the child was driving

17    the car?

18    A.    Yes, ma'am.  The second one.  He actually hit two cars.

19    Two parked cars.

20    Q.    And so how old was he at that time?

21    A.    Five, ma'am.

22    Q.    And so as a result of that, Child Protective Services

23    became involved; is that correct?

24    A.    Yes, ma'am.

25    Q.    And as a result of them becoming involved, did they tell

1   you all -- because they were living with you, Ms. Taylor and

2   John Doe; is that right?

3   A.   Yes, ma'am.  But you have to understand, even though they

4   may have been living with us, they didn't always stay there.  So

5   you know, just like the second incident with the parked cars,

6   she was actually at her mother's house at that particular time,

7   had been there for a couple days.  So some days she would be

8   there two or three days and some days mom's house or other

9   places.

10  Q.   So she moved around during this time period?

11  A.   Yes, ma'am.

12  Q.   But as a result of CPS coming involved did they require you

13  all, wherever she lived, Deja Taylor, to have a lock box to put

14  her car keys in?

15  A.   Yes, ma'am.

16  Q.   Okay.  Would you tell us about that lock box?

17  A.   Well, I was present when CPS, at first they instituted a

18  safety plan, and in my opinion it was great.  Because it also

19  outlined, hey, look this is what you need to do to be safe or to

20  keep him safe with car keys, medications or anything else.

21       You also, you guys also need to get counseling, which they

22  said that they put in motion, counseling for mom and counseling

23  for him, which never happened.  It never happened.  I think they

24  called after, what, in February, which was well after the

25  incident, and said, hey, we finally got you guys on the

1  schedule, which is another story.

2      But the counseling never happened.  The intensive in-home

3  stuff never happened.

4      The follow-up pertaining to the lock box, my granddaughter

5  took a picture of the lock box and sent it to CPS.  The lock box

6  is in the same location as it was back in June when they

7  directed her to get it; however, according to the court records,

8  one set of law enforcement said the lock box is not present.

9  The lock box is present.  It was present January 6th when I

10 escorted them in the room and said, hey, this is my bedroom,

11 this is where the lock box is.

12 Q.   What's what I want to ask you.  Where was the lock box?

13 A.   In my bedroom in the closet.

14 Q.   Okay.

15 A.   That's where it is right now.

16 Q.   And the car keys were supposed to be kept in that; is that

17 correct?

18 A.   Car keys, medication, or if someone had a weapon, it could

19 have easily been put in that lock box.

20 Q.   Did you ever see a weapon in that lock box?

21 A.   No, ma'am.

22 Q.   And who had the keys to the lock box?

23 A.   It's a combination, ma'am.

24 Q.   A combination.  Who had the combination?

25 A.   I have it, Mrs. Taylor has it, my granddaughter has it.

1   Q.   "Mrs. Taylor" being your wife; is that correct?

2   A.   Yes.

3   Q.   And where was the lock box located in your bedroom?

4   A.   In the closet on the top shelf.

5   Q.   So how could you get to the lock box?

6   A.   Just slide the closet door open, walk into it.  I'm tall.

7   Q.   Because you're tall, correct?

8   A.   Right.

9   Q.   So your great-grandson, John Doe, if he wanted to get to

10  that lock box, how could he get to that lock box?

11  A.   He is very creative.  Has a lot of initiative.  He has a

12  step stool that belonged to my mother, he knows it's his and he

13  knows it was hers, he will grab that step stool or anything else

14  he needed to.  If he wanted to, he can go to that lock box.  But

15  he doesn't have the combination.

16  Q.   And did you ever find evidence, before the school shooting,

17  where he had tried to get into that lock box?

18  A.   I've heard when he was at his dad's mom's house, because

19  that -- his other grandma called and said that he had tried to

20  manipulate her lock box.  But other than that, he never tried to

21  get in that lock box at my house that I know of.

22  Q.   And the lock box, did it always stay in your bedroom in the

23  closet?

24  A.   Yes, ma'am.

25  Q.   Now, you were asked a number of questions about some of

```
 1    John Doe's behavior.  Were you aware that the year before he

 2    choked out a teacher at the school?

 3    A.    No, ma'am.  And I can tell you why.

 4         That day that incident allegedly happened I got a call and

 5    said can you come pick him up.  Because I dropped him off that

 6    morning.  I went back to the school and they said, yeah, mom had

 7    just came and got him; however, he was throwing toys at the

 8    teacher.  That was the explanation that I got.  I didn't know

 9    until after January 6th when all this other stuff started

10    happening that that's what happened.

11         When I got full custody and I had the paperwork, the

12    documentation to request his school records, that is not even in

13    the school records that I have.  So if it is documented, if it

14    is a matter of proof, I never received it.  If it happened, you

15    know, so be it.  But I have a copy of his official school

16    records that I obtained when I became guardian of him, and I

17    don't have that.

18    Q.    Okay.  So during this time period you were not the

19    custodian or the guardian of him; is that correct?

20    A.    No, ma'am.

21    Q.    So you've told Judge Davis about that his attendance in

22    school wasn't kept up.  Well, who was supposed to get him to

23    school?

24    A.    Well, ma'am, I think that's obvious:  My granddaughter.

25              MS. McKEEL:  That's all the questions I have, Judge.
```

```
 1              THE COURT:  Any other questions for this witness?

 2              MR. ELLENSON:  No, sir.

 3              THE COURT:  All right.  Thank you, sir.  You may step

 4    down.  You're excused.

 5              MR. ELLENSON:  We have no other evidence, Judge.

 6              THE COURT:  All right.

 7              Mr.Osyf, you said that you had a impact statement that

 8    you wished to have given orally, and I'm happy for you to

 9    present that at this time if you would like to do that.

10              MR. OSYF:  Thank you, Your Honor.

11              MS. ZWERNER:  My name is Abigail Zwerner.  On

12    January 6th, 2023, I was shot in my first-grade classroom by my

13    six-year-old student who had gotten a hold of the defendant's

14    illegally purchased firearm.  The boy pointed the gun directly

15    at me and shot.

16              The single bullet went through my left hand and lodged

17    into my upper left chest, leaving traces of bullet fragments in

18    both areas that will remain forever.

19              As the bullet ruptured my body, as if upon a mission

20    to bring me to my death, bones were broken in my left hand and

21    ribs.  My left lung collapsed, robbing me of my air supply and

22    causing me to lose consciousness.  When this happened and

23    emergency responders worked to keep me alive, I was not sure

24    whether it would be my final moment on earth.

25              I have undergone five surgeries and regular, intensive
```

 1   physical therapy appointments just to restore motion in my hand.

 2            This tragedy has taken a toll not just on me, but on

 3   my family.  My mom and sister had to take time away from their

 4   work, and my brother moved his life across the state so he could

 5   be here to help.

 6            Having stitches in multiple places on my body from

 7   various surgeries, I was not able to take a shower because the

 8   stitches and wounds needed ample time to heal.  My mom and

 9   sister had to use a washcloth with soap to wash me each day and

10   I had to get my hair washed at a salon.

11            Due to the pain in my hand, I was not able to do

12   simple tasks such as putting on and taking off clothes, tying my

13   shoes, opening bags, and cutting my food, as examples.

14            I had to stop going to my gym, which is part of my

15   daily routine that kept me healthy and in shape.  I was unable

16   to walk long distances without getting winded as my lung

17   recovered from its collapse.  I especially could not hold

18   weights in my left hand for exercise.

19            Recently, the health of my hand has regressed.  I

20   still have pain and limited motion.  We don't know if it will

21   ever return to normal.

22            In addition, the aftermath of this monstrous event

23   caused my mental health to rapidly decline.  I lost myself

24   following the shooting.  I could barely communicate with my

25   friends and family.  I had so many loved ones and friends reach

1    out, and I mentally did not have the capacity to respond.

2           I suffer from anxiety and depression and have been

3    diagnosed with post-traumatic stress disorder.  I sought to now

4    attend therapy twice a week and utilize General Talk Therapy as

5    well as Eye Movement Therapy, or EMDR, to cope with these

6    diagnoses.

7           The shooting has instilled many fears in me that will

8    remain with me forever.  I get anxious in crowded places, always

9    looking around to make sure I'm safe.  I get scared of seeing a

10   single male walking by himself and fear he might harm me.  I am

11   terrified when I see a person wearing a jacket with their hands

12   in their pockets, fearful they might have an illegal firearm in

13   their pocket like my shooter, waiting for their moment to

14   pounce.

15          I have nightmares of gore, blood and death, always

16   involving a firearm.  I have nightmares of me screaming at

17   people, warning them to run away.  I have nightmares of a

18   perfectly good day suddenly going wrong at the expense of a

19   fired gunshot.  I rely on prescribed medication to force myself

20   to sleep because I cannot go to sleep on my own anymore.

21          The shooting has brought upon a massive wave of

22   financial loss.  My bills have been mounting.  The hospital

23   bills, five surgery bills, bills for checkup appointments,

24   occupational therapy appointments and regular therapy

25   appointments.  The bills associated with the shooting and my

1  recovery continue to grow week by week.

2          As a result of the incident and the associated fear

3  and anxiety, I am unable to teach again.  I have lost my income.

4  Without a career, I am unsure how I will support myself

5  financially in the future.  A Master's degree I earned and paid

6  for to advance my career in education now holds no value to me.

7  My life and once-cherished career have been completely turned

8  upside down.

9          I feel as if I have lost my purpose.  I loved

10  children, and now I'm scared to have a job involving them.  I

11  was in love with my career, and now it's been stripped of me.

12          Now at 26 years old, what am I supposed to do?  I

13  don't have a direction anymore, and this makes depressed.

14          Having said all of that, I am hopeful that life will

15  get better.  Thanks to all the love and support I receive from

16  family and friends, I know that whatever my life holds, it will

17  be one surrounded by their love.  The kindness of people close

18  to me and from those in far places I've never met is proof that

19  there is good in the world, and I will cling to that idea.

20          Still, sadly, my life will never be close to the same

21  again.  Not only do I bear physical scars from the shooting that

22  will remain with me forever, I contend daily with deep

23  psychological scars that plague me during most waking moments

24  and also invade my dreams.

25          This permanent damage should never have been allowed

```
 1   to happen to me and would not have happened if not for the

 2   defendant's actions or lack thereof.

 3             Thank you.

 4             THE COURT:  Thank you.

 5             Mr. Osyf, any others?

 6             MR. OSYF:  No, Your Honor.

 7             THE COURT:  All right.  Well, that being all the

 8   evidence in the case, then I will hear your arguments.

 9             MR. ROSSI:  Your Honor, Mr. Taylor would like to make

10   a statement.

11             THE COURT:  The same person that testified?

12             MR. ROSSI:  Yes.  Yes.  In addition to his testimony.

13             THE COURT:  I see.  All right.  Do you want him to

14   take the stand again?

15             MR. ROSSI:  No, he can just stand at the podium if the

16   Court allows it.

17             THE COURT:  All right.  Is this in the way of a victim

18   impact statement?

19             MR. ROSSI:  It's just allocution on behalf of Ms.

20   Taylor.

21             THE COURT:  Well, I'll tell you what, why don't we go

22   ahead and let him just have a seat and relax and sit on the

23   witness stand and then he can make his statement.

24             MR. ROSSI:  Thank you, Your Honor.

25             THE COURT:  All right.  Mr. Osyf?
```

1          MR. OSYF:  That's fine, Your Honor.  Thank you.

2          THE COURT:  Mr. Taylor, did you want to -- you wanted

3     to make a statement to the Court?

4          MR. C.J. TAYLOR:  Yes, Your Honor.

5          THE COURT:  All right.  Please go ahead.

6          MR. C.J. TAYLOR:  Thank you.  I appreciate you giving

7     me an opportunity to make this statement.

8          Just like every parent, I was upset when I heard the

9     news.  I was one of the first responders to the school that day

10    outside when they held everybody there, because I was worried

11    about my great-grandson.  Had no idea until after two hours that

12    he was the assailant, for lack of better terms.  But I think

13    it's worth noting that my great-grandson is a victim as well.

14    My granddaughter is a victim as well.

15         Now it's very unfortunate that someone got hurt.  I'm

16    deeply saddened that the other kids in that classroom had to

17    witness that, because they're going to be affected for the rest

18    of their lives.  People have lost their livelihoods that they're

19    never going to get back, as well the victim, A.Z.

20         But I think it's worth noting that we tried everything

21    to give my granddaughter an opportunity to have a decent life.

22    And she still has that opportunity.  But she's going to need

23    some assistance.  I think it's safe to say that she's a victim

24    of domestic abuse, she's a victim of drug abuse, and she's

25    really a victim of some bad choices.  But she will have an

 1  opportunity to move forward.

 2          My great-grandson has a wonderful opportunity, because

 3  he's now in a different environment.  He's learning.  He's

 4  progressing.

 5          My main thoughts were what would make someone who's

 6  barely learning how you to tie their shoes or to ride a bike

 7  without training wheels be able to manipulate a weapon of such

 8  destruction?  What would make someone that angry?

 9          After attending several sessions, one of which my

10  granddaughter recently attended, we're getting the answers to

11  those.  But he's in a better place now.  I think my

12  granddaughter is in a better place now that she's getting the

13  assistance that she needs.

14          And in a lot of ways the system failed both of them,

15  because I took them to places to get help.  I sat in the car

16  with my little man while she was trying to get help.  Even after

17  CPS made that safety plan after the car incidents, they never

18  followed up, they never made a serious attempt to do anything.

19  I even called them and said, hey, my granddaughter's not doing

20  what she's supposed to be doing, when are you all going to come

21  check?  When are you going to follow-up?  Instead, they would

22  say, oh, well, you have a issue with the case worker?  No, I

23  didn't have an issue with the case worker, I had an issue with

24  my granddaughter not living up to her motherly responsibilities.

25          But we love her.  We have a strong family.  We have a

 1    good support base with friends.  I think she's going to get

 2    through this.

 3              I'm really deeply sorry, especially from my family, to

 4    A.Z.

 5              Thank you.

 6              THE COURT:  All right.  Thank you.  You may step down.

 7              Mr. Rossi?

 8              MR. ROSSI:  Your Honor, I have a statement Ms. Taylor

 9    would like me to read.  Should I do it now or later?

10              THE COURT:  Well, if it's in the form of allocution,

11    then we'll wait till just after argument --

12              MR. ROSSI:  Thank you, Judge.

13              THE COURT:  -- and then I'll confirm with her there's

14    nothing else she wants to say beside what's in that statement.

15              All right.  If there's no more evidence, I'm happy to

16    hear your argument.  Who will be arguing for the government.

17    Mr. Osyf?

18              MR. OSYF:  Yes, Your Honor.

19              THE COURT:  And tied up in that, as you all know, the

20    guidelines, 5G1.3(C) contain a provision involving whether the

21    sentence should run concurrent to any anticipated term of

22    imprisonment, and essentially it says that for the sentence to

23    be a guideline sentence, then because a state term of

24    imprisonment is anticipated to result from another offense that

25    is relevant conduct to the instant offense of conviction under

1    the provisions of the Guidelines, the sentence for the instant

2    offense shall be imposed to run concurrently to the anticipated

3    term of imprisonment.  And so a guideline sentence would run it

4    concurrent, a non-guideline sentence would not.  And so I wanted

5    to raise that with you all so you could also comment on that in

6    your argument.  Thank you.

7            MR. OSYF:  Thank you, Your Honor.  And I'm happy to

8    address that at the outset.

9            The government concedes that that guideline is

10   applicable, but I don't believe it's in any way binding on this

11   Court to fashion a sentence that must run concurrent.  And the

12   United States asks for a guideline sentence here to run

13   consecutively to any sentence imposed by the state to adequately

14   account for the different sovereigns' interests at stake here.

15           So understanding that it applies, the government is

16   still asking this Court -- who is not bound to do so -- to run

17   any imposition of imprisonment consecutive to anything that

18   might be imposed by the State.

19           THE COURT:  All right.  Thank you.  You may proceed.

20           MR. OSYF:  Thank you, Your Honor.

21           To be clear, as indicated in the government's position

22   paper, this is not a marijuana case.  This case is about lawful

23   gun ownership and the irreparable damage that can occur when

24   individuals feel they do not have to comply with the law when

25   purchasing a firearm.

1           I'm not going to go into detail on all the 3553(a)

2   sentencing factors that the Court is going to consider today,

3   but I would like to focus on three in particular.  That's going

4   to be the nature and circumstances of the offense, the history

5   and characteristics of the defendant, and general deterrence.

6           This is not just about a single illicit event that

7   resulted in a tragedy less than six months later, but the

8   deliberate, continued criminal conduct directly responsible for

9   a first-grade teacher nearly losing her life.

10          Ms. Taylor knew, she knew she was an unlawful user of

11  or addicted to a controlled substance when she was a teenager.

12  She knew she was an unlawful user of or addicted to a controlled

13  substance on July 19th, 2022 when she chose to expressly make a

14  false written statement that she was not in order to obtain a

15  firearm.  And she knows she's an unlawful user of or addicted to

16  a controlled substance still here today.

17          Thomas Jefferson is credited with writing "Ignorance

18  of the law is no excuse in any country.  If it were, the laws

19  would lose their effect because it can always be pretended."

20          That said, we of course do not require the general

21  populace to know all the laws.  The government has a duty to

22  appropriately disseminate new laws to the public and to make

23  them publicly accessible.

24          The U.S. Supreme Court has made some exceptions to the

25  ignorance is not an excuse rule.  In the 1957 case of Lambert v.

1  <u>California</u>, 355 U.S. 225, 1957, the Court ruled that Lambert's

2  failure to register as a felon after moving to Los Angeles was a

3  "wholly passive act".  Lambert, who had been previously

4  convicted of forgery, was unaware of an ordinance requiring that

5  he register as a felon if in the city of Los Angeles for more

6  than five days.  Because she was not allowed to use ignorance of

7  the law as a defense, she was convicted, fined $250, and

8  sentenced to three years probation.

9          The Supreme Court reversed that conviction, and

10  Justice William Douglas wrote in the Court's majority opinion,

11  "Where a person did not know of the duty to register and where

12  there was no proof of the probability of such knowledge, he may

13  not be convicted consistent with due process."

14          Another exception, the U.S. Supreme Court has carved

15  out with record regard to ignorance of the law deals with the

16  Tax Code.  In the 1991 case of <u>Cheek v. United States</u>, 498 U.S.

17  192, 1991 the court wrote, "The general rule that ignorance of

18  the law or a mistake of law is no defense to criminal

19  prosecution is deeply rooted in the American legal system.  The

20  proliferation of statutes and regulations has sometimes made it

21  difficult for the average citizen to know and comprehend the

22  extent of the duties and obligations imposed by tax laws.

23  Congress has accordingly softened the impact of common law

24  presumption by making specific intent to violate the law an

25  element of certain federal criminal tax offenses.  Thus, the

1  court, almost 60 years ago, interpreted the statutory term

2  willfully as used in the federal criminal tax status as carving

3  out an exception to the traditional rule.  The special treatment

4  of criminal tax offenses is largely due to the complexity of the

5  tax laws."

6         Ms. Taylor's offenses of convictions were not a wholly

7  passive act, as in the former exception, nor are we talking

8  about something so complex as United States tax law as in the

9  latter.  Even if Ms. Taylor walked into Winfrey Firearms and,

10 thinking that her daily drug use did not preclude her from

11 purchasing a firearm, the ATF Form 4473 itself is undeniably

12 unambiguous.

13        July 19, 2022, if you remember from task force

14 officer's testimony, was not even the first time that Ms. Taylor

15 had filled out a form 4473.  She had purchased a High Point

16 months earlier, filling out the same form.  It's hard to imagine

17 what more one would like the government to do to not only

18 apprise one of the law, but to emphasize the importance that one

19 pays attention to it.

20        This is not the Tax Code we're talking about here,

21 Your Honor, nor some voluminous, confusing insurance policy.

22 We're talking about 12 simple questions that the purchaser must

23 answer by physically checking a box and then additionally

24 certifying that their answers are true, correct and complete

25 under penalty of law.  And for a federal felony at that.

1          Filling out a 4473 to purchase a lethal weapon is not

2    the same as, say, accepting one's smartphone updates Terms of

3    Service.  The United States is unaware of any case where, six

4    months after an individual accepted an operating system's Terms

5    of Service Agreement without reading it, their phone permanently

6    injured and very well could have killed another human being.

7    Any suggestion at all that these two scenarios are remotely

8    analogous to one another should offend all sensibility.

9          Ms. Taylor's consistent and prolonged drug use

10   contemporaneous with her possession of her unlawfully purchased

11   firearm nearly resulted in someone's death.  The nature and

12   circumstances of the offenses of conviction weigh heavily in

13   favor of imposition of imprisonment here.

14          Similarly, the history and characteristics of

15   Ms. Taylor are deeply concerning.  The words, actions and

16   intentions expressed in her text messages depict a very

17   different portrait than what has been on display since Ms.

18   Taylor's prosecution began.

19          And make no mistake, Your Honor, Ms. Taylor is here

20   today in significant part thanks to the concerted efforts of her

21   loving and supportive family and the exceptional advice of her

22   counsel.  Through prudent steps, only the tip of the iceberg and

23   the most egregious conduct of this case has seen the light of

24   day.

25          The Court has heard witnesses firsthand as Mr. Taylor

1   took the stand and eloquently and lovingly and passionately

2   spoke about his granddaughter.  But that is not mitigating for a

3   sentence to be imposed on Ms. Taylor.  In fact, the government

4   would hold that that is probably aggravating.  She has been

5   afforded opportunities that most defendants before this Court do

6   not get:  A consistently loving, helping family member there,

7   time and time and time again.  Instead, she makes the choices

8   that resulted in why we are here today.

9          The behavioral conduct during the December 27, 2022

10  shooting brings into sharp relief the devastating combination of

11  substance abuse and firearms.  "Drugs help fill a void" Ms.

12  Taylor texted shortly after discharging a firearm in public at

13  two people.  Ten days later, that same firearm would be fired

14  again, this time with catastrophic and life-altering

15  consequences.  Not just for the victim, but for so many children

16  and the entire community.

17         Perhaps most of all, Your Honor, I implore the Court

18  to consider general deterrence in this case.  The public must

19  know that they cannot disregard the law to purchase a firearm

20  without consequences.  It may be a right for law-abiding

21  citizens to bear arms, but that does not mean it comes without

22  significant responsibility.  If someone wants to drink alcohol,

23  fine.  But don't get behind the wheel of a car intoxicated.  We

24  rightly punish such conduct.

25         And this situation is far more egregious.  Daily use

1  of a controlled substance is illegal and, by itself, inherently

2  dangerous.  Adding a lethal weapon into the equation demands

3  action and consequences.

4        A guideline sentence of 21 months is certainly not

5  greater than necessary, Your Honor, and would, in fact, be a

6  lenient sentence considering all the 3553(a) sentencing factors;

7  the fact that this firearm was used not once, but twice, merely

8  10 days apart, and the lifetime of harm caused to many, all

9  because the defendant chose to deliberately disregard the law,

10  in black and white, right in front of her face, to obtain a

11  firearm.

12        Thank you, Your Honor.

13        THE COURT:  Thank you, Mr. Osyf.

14        Mr. Rossi?

15        MR. ROSSI:  Yes.  Thank you, Your Honor.

16        My colleague brought up a good point that is very

17  important for the judge's role in this case, and submit that the

18  key thing for Your Honor to decide is a sentence that is

19  "sufficient but not greater than necessary."

20        Before I get to the personal characteristics of Deja

21  Taylor, because that's a very important consideration for Your

22  Honor, I want to concede that there is an argument to be made, I

23  will concede, for general deterrence.  But for specific

24  deterrence as to Ms. Taylor, I want to go through some of the

25  personal challenges and hurdles in her life that make this case

```
 1    unique.

 2            I do want to say this:  I've tried 40 tax cases, and I

 3    never thought in a gun case we'd be talking about United States

 4    v. Cheek.  But I think the specific facts of Cheek are important

 5    here, because they contrast with Ms. Taylor.

 6            Mr. Cheek was a tax protester.  I think he served in

 7    the military.  He was an airline pilot.  And he got lucky.  The

 8    Supreme Court said that they had to have specific subjective

 9    intent about the law, because Title 26, Your Honor, is very

10    complicated.  I did 30 cases involving that.

11            But this is not a complicated case.  Ms. Taylor

12    pleaded guilty.  She admitted that when she signed the form she

13    was not truthful.  Mr. Cheek went to trial and disputed his

14    guilt.  Ms. Taylor has admitted her guilt.  It is a simple form.

15    Counsel for the government is right.  It's not complicated.  We

16    don't need Thomas Jefferson to explain that.  So I just want to

17    say, she is remorseful and accepts her responsibility and is not

18    arguing that she didn't know what she was doing.  She knew what

19    she was doing.  And on the two events that have been referenced,

20    she is remorseful.

21            But I want to go back to who Deja Taylor is, Your

22    Honor, because this gets to the personal characteristics of

23    3553.  There is a lot of evidence that was presented here that

24    she has one of the best grandfathers anybody in the United

25    States could ever have.  And her mother is here.  And she's a
```

 1  wonderful mother.  There's no doubt that her mother and her

 2  grandfather are top-shelf people.  Top-shelf.

 3          But Ms. Taylor has challenges in her life that you can

 4  have the best parents in the world, the best, and still have

 5  challenges in your life, and you could have the worst parents in

 6  the world and turn out to be a Rhodes Scholar from Hope,

 7  Arkansas.

 8          So what I want to say is this:  The Court needs to

 9  consider, in imposing this sentence, a variance.  Because she

10  has challenges.

11          Addiction is a disease, Your Honor, and mass

12  incarceration is not the cure.  I'm not saying you should never

13  incarcerate somebody if they have addiction issues and break the

14  law, but a significant sentence that's driven in main part by an

15  addiction?  We've seen hundreds, thousands of cases where people

16  are addicted and they go to prison because of it.  The Congress

17  of the United States has made a decision that drugs are really

18  bad.  Fentanyl.  Oxy.  So we get that.  But she has a disease,

19  Your Honor, and that is an important consideration for this

20  court in any sentence.  I don't care if it's a tax case.

21          And since she was a teenager, sadly, she met up with

22  Malik Ellison.  And that was a toxic relationship.  And that's

23  where the slippery slope became a luge.  They had a volatile

24  relationship.  Mr. Taylor, her great-grandfather -- or her

25  grandfather, who is a great man -- said it was volatile.  So

1  that just became worse.

2  　　　　And we're not going to dispute that for many years she

3  has abused marijuana.  We're not even going to challenge that.

4  But her addiction is something that needs to be addressed when

5  the Court considers the sentencing.

6  　　　　Let's now talk about mental health challenges.

7  Mr. Taylor mentioned all the therapy.  I stopped writing, there

8  were so many sessions that have been on her agenda, Ms. Taylor's

9  agenda.  It's beyond... Suicidal ideation.  Schizophrenia.  I

10  mentioned it on Page 4 and Page 5 of my brief.  Those are issues

11  we cannot ignore.  And by incarcerating Ms. Taylor, those issues

12  will not get better, they will probably get worse.

13  　　　　For example, Your Honor, if someone has autism,

14  whether it's Stage 1, 2 or 3, that's a consideration because the

15  prison system may not be able to address it.

16  　　　　My point is this, Your Honor:  Ms. Taylor has

17  emotional, psychological and addiction issues that need to be

18  addressed, and we don't think incarceration, Your Honor, is the

19  best place to address that.

20  　　　　But I want to talk about the whole life of Ms. Taylor.

21  She's 26.  She was born in Newport News.  This is her area.  She

22  has family here.  She did have parents that were very loving and

23  concerned about her welfare.  She went to Denbigh High School.

24  She had difficulties in the classroom.  And that's where things

25  got a little worse for her.  And she became pregnant at a very

1  young age.

2       And of course has John Doe, who is now seven.  I did

3  want to say this:  She had to drop out of high school in 2014.

4  And I'm going to get a little personal.  My dad, my hero, Your

5  Honor, he dropped out after the eighth grade.  He never went

6  back.  His mother died in a fire accident and his father had a

7  heart attack two years later.  He was an orphan when he was age

8  15.  And he had challenges in his early life.  And I want to

9  stress this:  When you're in your teens and you have to drop out

10  of school, that is an incredible emotional toll on the

11  confidence and the mental health of anybody.  And Ms. Taylor

12  faced a lot of challenges in her teens, and she did resort to

13  marijuana.  But we have to consider that in deciding, is she

14  worthy of deterrence?  Is she worthy of deterrence in this case?

15       I want to add this:  The incident that involved the

16  U-Haul that was brought out, I'm not disputing the facts.  But

17  we have to make it clear that this is a case about two counts,

18  lying on a form and making a false statement, among other

19  things.  And the tragedy that occurred, the U-haul, and of

20  course the tragedy that occurred on January 6th of this year and

21  Ms. A.Z.'s statement was profound.  It was beyond moving.  It is

22  beyond moving.  But at the end of the day, Your Honor, sending

23  her to prison for a significant period, if at all -- and we

24  recommend probation with conditions that we put in our brief,

25  home confinement and counseling -- we have to stress this, and

1    we put it clearly in the opening paragraph of our brief, we

2    cannot stress enough, that Ms. Taylor is deeply saddened,

3    extremely despondent and completely remorseful.  Let me repeat

4    that.  Completely remorseful for the unintended consequences and

5    mistakes that led to the horrible shooting of this wonderful

6    teacher, Ms. A.Z.

7                And there is no evidence in the record, none, zero,

8    nada, that when she filled out that form falsely she intended

9    the events of January 6th.  Did she make mistakes?  Was she

10   careless?  Yes.  But at the end of the day, Your Honor, it goes

11   back to a sentence that is sufficient but no more than

12   necessary, and we submit, Your Honor, that incarceration is not

13   the key here.  With her personal characteristics, we think

14   probation is appropriate.

15               Thank you, Your Honor.

16               THE COURT:  All right.  Thank you, Mr. Rossi.

17               Is there anything else?

18               MR. OSYF:  Your Honor, I would just like to say that

19   probation is clearly not the key here either, as evident from

20   Ms. Taylor's continued abuse of substances while on bond

21   throughout this entire process.

22               THE COURT:  All right.  Mr. Rossi, you said that you

23   had a statement you wanted to read as allocution for Ms. Taylor?

24               MR. ROSSI:  Yes, Your Honor.

25               THE COURT:  Ms. Taylor, can you step up to the podium

1   with Mr. Rossi, please?  And why don't you all switch places so

2   I can see you.

3           MR. ROSSI:  I'm sorry.

4           THE COURT:  Ms. Taylor, I understand that you have

5   written out a statement that you'd like Mr. Rossi to read.  Is

6   that correct?

7           THE DEFENDANT:  Yes, sir.

8           THE COURT:  And do you want to waive the right to make

9   an oral statement yourself at this time?

10          THE DEFENDANT:  Yes.

11          THE COURT:  All right.  Go ahead, Mr. Rossi.

12          MR. ROSSI:  All right.

13          "Your Honor, I am extremely sorry and very remorseful

14  for my actions.  I will feel remorse for my actions for the rest

15  of my life.  I want to thank Your Honor for the careful time and

16  attention given to my case.  Once again, I am sorry."

17          THE COURT:  Thank you.  You all can have a seat.

18          All right.  So Mr. Rossi, is there any reason that

19  sentencing should not take place at this time?

20          MR. ROSSI:  No, Your Honor.

21          THE COURT:  Okay.  So I'm going to, before sentencing,

22  review the statutory sentencing factors.  They are designed to

23  ensure that the sentence imposed is, as you all have noted,

24  sufficient but not greater than necessary to satisfy and comply

25  with the purposes of sentencing, which we call the parsimony

1   principle.  The Court doesn't have to recite all of the factors,

2   but I've considered them all, and I'll talk about many of them

3   now, and as I normally do, I'll use the presentence report as a

4   template for reviewing the factors.

5           I have considered all the defendant's and the

6   government's arguments with respect to whether the sentence

7   should fall within or outside of the guidelines, and of course

8   the parties are asking for differing sentences.

9           So the first factor is the nature and circumstances of

10  the offense and the defendant's history and characteristics,

11  including her criminal history.

12          Defendant is here having been found guilty of being an

13  unlawful user of controlled substance in possession of a

14  firearm, and making a false statement during purchase of a

15  firearm.  She was released on a personal recognizance bond on

16  June 12, 2023.  She's approximately 26 years old.

17          At the plea in this case, the government and the

18  defense agreed that the applicable guideline range would be 18

19  to 24 months in the Bureau of Prisons, and the parties agreed

20  that the sentence the Court imposed would be no more than 24

21  months at the Bureau of Prisons.  While I'm certainly not bound

22  by that, I have always said that generally the parties coming

23  before me know a lot more about the case than I do because they

24  have lived with it in such detail for so long, and these kind of

25  agreements mean a great deal to the Court, generally.

 1          After Ms. Taylor was placed on pretrial supervision,

 2   the records as reflected in Paragraph 6 indicate that she

 3   complied with all of the Court-ordered conditions for release

 4   except testing positive for marijuana June 13th, July 19th,

 5   August 25, September 1, September 5, and now we have also the

 6   violation report reflecting the confirmed drug tests on

 7   September 28, October 3rd and October 16th.

 8          She did fail to report to the office to provide a

 9   urine screen on August 16th and August 22nd.  She was to begin

10   substance abuse treatment on August 17th, but she failed to

11   answer her phone.

12          After rescheduling treatment to August 24th, she again

13   failed to answer her phone.  She then began treatment on

14   August 31st and has attended treatment since then.

15          The government filed a motion to have defendant's bond

16   revoked and a hearing was conducted on September 22nd.

17   Defendant admitted to the violations and Judge Miller continued

18   her on the same period of supervision.  And she, through the

19   date that this presentence report was prepared, had complied

20   with conditions of her bond except for positive tests as noted

21   here, September 28, October 3rd and October 16th.

22          When confronted with the results, she denied using

23   marijuana again, but the urine screens were confirmed to be

24   positive for marijuana.  No additional evidence has been

25   presented today, and the Court does treat those as violations

1  and makes that finding.

2       Now, the offense conduct is reflected in the agreed

3  statement of facts that the parties submitted to Judge Miller at

4  the plea hearing.  They are contained at Paragraph 8.  We've

5  heard much of it here today.

6       On January 6th, 2023, a six-year-old male child, John

7  Doe, shot and severely injured his first-grade school teacher,

8  A.Z. in the classroom at Richneck Elementary School in Newport

9  News.

10      A Taurus 9mm semiautomatic handgun was found and

11  collected from the classroom by a crime scene technician.

12      ATF agents initiated the emergency trace we heard

13  about today, and it revealed the sale of the gun on July 19th,

14  2022, from Winfrey Firearms in Yorktown.  Agents went there and

15  obtained a copy of the form.  We've seen that today.

16      Agents conducted a controlled garbage bin search on

17  January 12 and found copious amounts of marijuana and packaging

18  for marijuana edibles at defendant's home she was then using.

19      On January 19th, agents executed a federal search

20  warrant at Taylor's home.  She was not present, but her

21  grandfather, C.T., was present and told agents on the evening of

22  January 6th she had taken some belongings in a suitcase and left

23  his residence and began staying at her mother's home.

24      During the search, the following items were seized

25  from her bedroom:  Narcotic packaging, narcotics paraphernalia,

1  suspected marijuana, marijuana residue.  And C.T. showed agents

2  garbage bags that he had placed in the garage after he cleaned

3  out the vehicle that he had loaned to Taylor.  According to him,

4  the car had broken down and he cleaned it out.  He placed her

5  belongings in the garbage bags a few weeks before the shooting.

6         These items were found:  A red box of ammunition, a

7  jar of suspected marijuana, narcotics packaging, and a black

8  firearm barrel lock.

9         Agents called Taylor's mother to ask for consent to

10 search the apartment and she agreed.  Taylor signed consent

11 forms, one for her cellphone and the others for a search of her

12 living area in her mother's apartment.  She consented to

13 searching her purse also.  These items were found there:  A

14 glass jar with suspected marijuana, marijuana paraphernalia,

15 used marijuana cigarettes and marijuana packaging material.

16        The following items were found in the bedroom occupied

17 by Taylor in her mother's apartment:  24.6 grams of marijuana,

18 approximately, marijuana edible packaging, marijuana

19 paraphernalia, including Dutch Master cigar wrappings, plastic

20 bags and burnt marijuana cigarettes.  And the marijuana items

21 were field-tested and returned positive for marijuana.

22        A lock box was not found in either of the Taylors'

23 rooms at her mother's apartment or at C.T.'s house -- though we

24 have heard further explanation for that today based on where it

25 was located -- nor was a trigger lock or a key to a trigger lock

1   ever found.

2          Defendant's cellphone contents were downloaded.

3   Numerous messages were found with other individuals illustrating

4   the pervasive scope of her marijuana use.

5          During the course of the investigation, agents found a

6   police report from the Williamsburg Police Department.  It

7   stated that on Saturday, April 3rd, 2021, at about 7 p.m., Ms.

8   Taylor was operating a Pontiac G6 registered to another person

9   on Richmond Road when she was stopped for speeding by an officer

10  with the police department.

11         The officer approached the vehicle and detected an

12  overwhelming odor of marijuana coming from the vehicle.  She was

13  in the vehicle with two other persons.  Marijuana was in plain

14  view inside the vehicle, so the officer conducted a search of

15  the vehicle.  I believe we heard here today that the two other

16  people were Mr. Ellison and also her son.  John Doe, a

17  four-year-old at the time, was in the vehicle at the time, and

18  directly next to him were several marijuana edibles that looked

19  like rice treats.

20         A backpack claimed by another person was searched and

21  it contained numerous individually packaged marijuana rice

22  treats, gummies containing THC, suspected crack cocaine, two

23  large bags of marijuana, two packages of Backpack Boys marijuana

24  from California, suspected Oxycodone pills, green plant

25  material, a smoking device, and more edibles.  Digital scales

1   were also found inside the vehicle.

2          Taylor's purse was searched and marijuana edibles and

3   three unknown white pills were found.

4          Ms. Taylor was advised of her *Miranda* rights and she

5   denied all knowledge of drugs inside the vehicle.

6          On July 19, 2022, Ms. Taylor completed a Bureau of

7   Alcohol, Tobacco, Firearms & Explosives Transaction Record 4473

8   as required to purchase the, it says "Tamus" but I think it

9   should be "Taurus".

10          Do you all have any objection to my correcting that?

11          MR. ROSSI:  No, Your Honor.

12          MR. OSYF:  No, Your Honor.

13          THE COURT:  All right.  The Taurus firearm in

14   Subsection B -- or in Section B of the form, it reads, "Are you

15   an unlawful user of, or addicted to, marijuana or any

16   depressant, stimulant, narcotic drug or any other controlled

17   substance?  Warning, the use or possession of marijuana remains

18   unlawful under Federal law regardless of whether it has been

19   legalized or decriminalized for medicinal or recreational

20   purposes in the state where you reside."

21          I think, lest I fail to remember to comment on this

22   later, it was of some interest to me when we were looking at

23   Government's Exhibit 1, which was the 4473 form, that

24   immediately before this Question 21 which has the subparts,

25   including e which I just read, are various other questions like

1   Social Security number, and you had to focus and check certain

2   boxes there.  Country of Citizenship, and you had to choose and

3   select a box there.  And then we have 21a asking whether you're

4   an actual transferee buyer of the firearm listed on the form and

5   explain what that meant.  "Are you the actual transferee/buyer

6   of the firearm listed on this form?"  And the box there is

7   checked "Yes".

8            Then b, "Are you under indictment, et cetera for a

9   felony?"  No.

10           "Have you ever been convicted in any court of a

11  felony?"  No.

12           "Are you a fugitive from justice?"  No.

13           And then the question about addicted to or user of

14  marijuana, et cetera, and No is checked.  And the Court took

15  note of that.

16           Paragraph Subpart 7 goes on.  Ms. Taylor checked the

17  box indicating the answer of No to the question, knowing she

18  was, in fact, an unlawful user of marijuana at the time of

19  purchasing the Taurus firearm.  And then it reviews the

20  certification which we've already reviewed here today, and I'm

21  not going to read that.  But there was a certification to the

22  correctness and completeness of the answers.

23           Ms. Taylor then admitted in Paragraph 8 that she did

24  unlawfully purchase and possess the firearm from a licensed

25  dealer knowing she had made a false and fictitious statement.

1          And again, lest I fail to say it later, Ms. Taylor

2    should be credited for accepting responsibility, pleading guilty

3    and admitting that she saw that, that she was untruthful when

4    she checked the boxes -- or the box.

5          It goes on to say that:  "Ms. Taylor admits that she

6    failed to accurately represent that she was an unlawful user of

7    a controlled substance at the time of the purchase and that she

8    was a daily user of marijuana and marijuana products for

9    approximately 11 years up to and including and after July 19,

10   2022."And she admits her chronic use of marijuana was not

11   recreational, it was -- and it affected her behavior.

12         She admitted that her answer was intended or likely to

13   deceive the firearms dealer with respect to a fact material to

14   the lawfulness of the sale of the Taurus firearm to her, and had

15   she truthfully answered yes, that the firearm dealer would not

16   have been permitted to transfer the Taurus firearm to her.  And

17   the Taurus was manufactured outside Virginia.

18         So that was essentially the agreed statement of facts

19   presented to Judge Miller.

20         It goes on to reflect in Paragraph 10 of the general

21   statement of the presentence report, not the agreed statement of

22   facts, that when she was questioned along with John Doe and

23   Mr. Ellison, John Doe was heard telling his father that he had

24   climbed the dresser to obtain the firearm from his mother's

25   purse.

1    Ms. Taylor told detectives that her father told her

2    that there was a shooting at the school -- it says "father" --

3    and when she went to get her purse from the dresser, she noticed

4    it felt light.  She looked in her purse and noticed her firearm

5    was missing.

6         She falsely claimed there was a lock box that used to

7    be on her dresser that was missing.

8         She also falsely advised that there was a bright red

9    trigger lock on the firearm and the key for the lock was tucked

10   under her mattress.  She reported that she kept the firearm

11   loaded.

12        She then falsely reported that she remembered

13   specifically that, on the morning of the shooting, she took the

14   firearm out of the lock box and put the trigger lock on it.

15        It should be noted that neither a lock box, trigger

16   lock, nor a key for a trigger lock were located during any

17   search warrant.  Of course we heard here today that the lock box

18   was stored high up on in C.T.'s closet at his home.

19        Paragraph 11 goes on to say that on January 13th -- so

20   that interview we just reviewed was January 6th -- but on

21   January 13th, as we've heard discussed here today, Ms. Taylor

22   was interviewed again by detectives and case agents, admitted

23   she began smoking marijuana at 17, and that she stopped using

24   for a period of time until John Doe was about eight months old,

25   and she used it again daily, but quit again after being stopped

1   in Williamsburg in April of 2021, and used again until after

2   John Doe shot his teacher.

3          The criminal history reflects the fact that there is

4   the outstanding state court matter.  She was arrested April 13th

5   in Newport News and has a child abuse/disregard life felony

6   charge pending to which she's pled guilty, and sentencing is now

7   scheduled for December 15th, 2023.

8          Her personal and family data reflects that she was

9   born in Newport News to her parents, and her patents did not

10  reside together after she was born.  She initially resided with

11  her mother and maternal grandparents.

12         She notes her father remained active in her life and

13  she had a good relationship with him throughout her childhood.

14         Her mother reports the defendant's father was in and

15  out of jail since she was a teenager and was incarcerated for

16  much of her childhood.

17         Her mother met Mr. Edwards when the defendant was

18  three years old and the defendant and her mother moved in with

19  him.  He helped raise the defendant and the two children he had

20  with the defendant's mother.  The defendant reported she did not

21  have a good relationship with him, and the defendant's mother

22  moved out of his home when she -- when the defendant was 12.

23  Defendant's mother confirmed this, and noted that the defendant

24  believed that she was treated differently by Mr. Edwards than

25  the way he treated his own children.  He caused problems, but

1  overall, she advised, her mother advised that the defendant was

2  raised in a loving home.

3         Defendant continued to reside with her mother until

4  she was 15.  She added that she was always provided the basic

5  necessities and she had a very good relationship with her

6  mother.  She denied that there was any physical or mental abuse

7  in the family home.

8         Defendant's mother reports she moved to Virginia Beach

9  when the defendant was 15, and the defendant moved in with her

10 maternal grandparents so she could finish her schooling in

11 Newport News with her friends.

12        Defendant noted that she remembers enjoying this time

13 in her life, as her grandparents were more loving and stayed

14 involved in her school activity.

15        Defendant noted that in her free time she enjoyed

16 playing soccer and playing the violin.

17        Her father is currently incarcerated.  Her mother

18 resides in Newport News and is employed, and she has three

19 half-sisters and two half-brothers.  She advises her father is

20 the only other family member with a criminal record, and no

21 others have substance abuse histories.

22        She notes she's mainly resided with her mother or

23 grandparents her entire life.

24        She's not been married, but does have the one child

25 with Mr. Ellison, and she has lived with the child since he was

1  born and has received assistance from her mother and

2  grandparents in raising him.

3       She also noted that Mr. Ellison has also been actively

4  involved in helping her.  Contact with Mr. Ellison confirmed

5  that defendant has lived with him, her mother or grandparents

6  while raising his son, and she has been active in his life and

7  he considers her to be a good mother to their son.

8       The defendant's mother confirmed that the child has

9  also resided with her and she has played a significant role in

10 raising the child, along with the defendant's grandparents.  It

11 should be noted the defendant claimed that Mr. Ellison had been

12 physically abusive during their relationship as referenced here

13 in the courtroom today.

14      A police report from Newport News Police Department

15 shows that September 28, 2020, defendant reported Mr. Ellison

16 came to her residence uninvited, an argument ensued, he pushed

17 her and tried to enter her residence.  She entered the residence

18 and he followed.  He allegedly hit her in the jaw and threw her

19 down on the ground.  He was charged with assault and battery and

20 entered her house to commit assault and battery.  The assault

21 and battery is still pending and the other charge was *nolle*

22 *prossed*.

23      According to records from Child Protective Services in

24 June of 2022, the defendant was asleep during the day when the

25 child retrieved his mother's car keys from her purse on a chair,

1   got into her vehicle and began to attempt to drive through the

2   apartment complex, backed into a parked car, and then pulled

3   forward into another parked car before maintenance personnel

4   stopped him.

5         A similar incident occurred a few months earlier when

6   he retrieved her car keys in the middle of the night and locked

7   himself in her vehicle.  He started the engine and began revving

8   the motor.  He refused to unlock the vehicle and police had to

9   break the car window to get him.

10        Defendant's grandfather obtained full custody of him

11  January 17, 2023, and he's been living with him in Newport News

12  since that time.  And we heard that testimony today, and the

13  treatment that he's receiving and the involvement of his

14  grandfather -- or great-grandfather, really, yeah, in his life.

15  It was helpful for the Court to hear that testimony.

16        Since January of 2023, Ms. Taylor has resided with her

17  sister, her mother and her mother's husband in Newport News.

18        Physically, the defendant advises her overall general

19  health is good.  She's not currently prescribed any medications.

20        She completed a substance abuse evaluation.  Indicated

21  she had emergency surgery in 2022.

22        She advises from a mental health standpoint she was

23  diagnosed with attention deficit/hyperactivity disorder,

24  depression and anxiety.

25        MR. ROSSI:  Your Honor, I hate to interrupt the Court.

1  She is currently prescribed Abilify.

2          THE COURT:  Spell that.

3          MR. ROSSI:  Yeah, A-b-i-l-i-f-y, and also Trazodone.

4  T-r-a-z-a-d-o-n-e.  The first is for psychological issues,

5  schizophrenia, and Trazodone is for sleep.  That's current

6  medication.

7          THE COURT:  I'm going write at the end of

8  Paragraph 41, "other than Abilify and Trazodone."

9          Any objection?

10          MR. OSYF:  No, Your Honor.

11          MR. ROSSI:  Thank you, Your Honor.

12          THE COURT:  All right.  So in addition to the ADHD she

13  was diagnosed with depression and anxiety, and those three

14  things when she was six or seven years old, and received

15  treatment but she could not recall where she received treatment.

16          She was prescribed Concerta, Adderall and Ritalin at

17  various times.  She stopped taking medications when she was

18  about 16, which would be about the time I guess that the

19  marijuana use started.

20          She notes that she contemplated suicide by laying on

21  train tracks when she was 16, and began cutting herself to feel

22  something when 17.

23          She reports she was hospitalized when she was about 18

24  years old after being involved in an automobile accident and

25  telling treating nurses that she wanted to have the accident.

1    She advised she was held at Riverside Regional Medical Center

2    for three days before being released after recanting her

3    statement.

4         She advised she was diagnosed with borderline

5    personality disorder and anxiety.  She notes she was prescribed

6    Xanax and other medications, but only took the medications for a

7    couple of weeks because she did not like how they made her feel.

8         She reports she attended weekly treatment sessions

9    with Hampton Community Services Board when she was 22 for about

10   six weeks before she stopped attending.

11        She attended mental health assessment at the Center

12   for Clinical and Forensic Services in July of 2023 and August of

13   2023.

14        She was diagnosed with borderline personality disorder

15   post-traumatic stress disorder and schizo affective disorder,

16   bipolar type, continuous.

17        It was recommended that she attend mental health

18   counseling and attend a psychiatric assessment.  She did attend

19   a psychiatric evaluation October 26th, and diagnosed there with

20   schizo affective disorder, bipolar subtype post-traumatic stress

21   disorder and borderline personality disorder.  She was

22   prescribed Abilify and Trazodone.

23        The defendant reports she first consumed alcohol when

24   she was a teenager and she continued to drink socially as an

25   adult.  First used marijuana when she was a teenager and used

1  the drug occasionally at parties.  She advises she could not

2  remember how often she was using marijuana before her son was

3  born.  She added that she began using marijuana again after he

4  was born, but again she was could not estimate how often.  She

5  stopped using marijuana for about a year after being stopped in

6  Williamsburg in 2021, and then began using the drug again after

7  the January incident.

8         She denied ever attending any substance abuse

9  treatment program, and there's no documented evidence to suggest

10  otherwise.

11         She submitted a urine screen to the probation office

12  in June of this year and was positive for marijuana, and

13  attended substance abuse assessment, diagnosed with cannabis use

14  disorder moderate, and it was recommended to attend a 10-week

15  outpatient substance abuse treatment program.  She subsequently

16  tested positive for marijuana again, July 19th, and failed to

17  report as directed for a urine screen August 16 and 22.  She was

18  also to begin substance abuse treatment August 17, but failed to

19  answer her phone for the substance abuse treatment.  Her

20  treatment was rescheduled to the 24th, but again she failed to

21  answer her phone.

22         Her pretrial officer directing defendant to come to

23  the office August 25th, and her apparent violations for testing

24  positive for drugs and failing to attend treatment were

25  addressed with her.  A urine screen was also attained that day,

1    and she tested positive for cocaine and marijuana.  When

2    confronted by her pretrial officer, she admitted to using

3    marijuana, but denied using cocaine.

4            She began substance abuse treatment August 31st and

5    has attended treatment since then.

6            She also attended or tested positive for marijuana

7    September 1, 2023 and September 5, 2023 before testing negative

8    for controlled substances September 11.  She then tested

9    positive for marijuana the 28th, the 3rd of October and the 16th

10   of October as confirmed by Alere Toxicology Services.

11           Educationally, she attended Denbigh High School and

12   dropped out in 2014 while in the 11th grade due to her becoming

13   pregnant.  She had been employed -- unemployed since August of

14   2021.  She's been unemployed and supported by her mother as

15   verified by her mother.  She had been employed part-time at

16   Charmed Lounge in Hampton, according to the Pretrial Services

17   report, and earned $400 a month as a stand-in employee from

18   April of this year until June.

19           From June to August she was employed part-time at

20   Williamsburg Resorts, and she left that job due to a dispute

21   with management.  For a year in 2020 she was employed part-time

22   working at a kiosk in Patrick Henry Mall, and 2018 for about a

23   year she was employed at Cotton On in Williamsburg as a manager,

24   and for about two years, '15 to '17, she was employed full-time

25   at the Fragrance Outlet in Williamsburg as a manager.

1          That is Factor 1.

2          Factor 2, the need for the sentence to reflect the

3   seriousness of the offense, and I'll say a bit about that.

4          It's certainly true that this is a case that is about

5   an unlawful user of controlled substances in possession, being

6   in possession of a firearm and making a false statement during

7   purchase of a firearm, it's not a case about marijuana.  There's

8   been much made about the difference in the states' treatment of

9   the legality of marijuana under state law versus the fact that

10  it continues to be unlawful federally.  The federal government

11  made that very clear in its Form ATF 4473.  And so the

12  seriousness of the offense has to do with the intent behind the

13  law, each of these laws.  The intent behind each of these laws

14  is to prevent, No. 1, in Count 1, somebody who is using

15  controlled substance from possessing a firearm because the

16  mixture of a firearm and the use of controlled substances often

17  has lethal effects.  And that's the purpose of the law.

18          The same stands for the false statement during the

19  purchase of the firearm.  While the Supreme Court has held that

20  there is a Constitutional right to possess a firearm and

21  reiterated recently the fact there are certain restrictions on

22  possession and use of firearms, and this is one of them.  And

23  this is a perfect example of why we have the restrictions.  And

24  so that forms the foundation of the offenses.

25          But the seriousness of the offenses is borne out by

1   the impact.  And the impact here is far-reaching.  We have the

2   victim impact statement of A.Z., who testified -- or who stated

3   here today movingly the effects that this shooting has had on

4   her.  And those are permanent effects, in many ways.  But they

5   are physical and they are psychological, they are vocational.

6   And it's, it's just a travesty that she has had to suffer in

7   that way because of the violation of these laws.  And you know,

8   you can draw the line from the violation of the laws to that

9   event in many different ways.  And you can argue that there were

10  opportunities at various points, offramps, so to speak, but you

11  can draw a direct line from the violations of these two federal

12  statutes to the events that happened at Richneck Elementary

13  School.

14          The seriousness of the offenses is even -- is

15  reiterated in the other victim impact statements that I have

16  from parents of children.  One from a parent of a child that was

17  there in the room that day.  And reading about the impact on

18  that child -- and I am sure on the other children in that

19  room -- makes it clear to me that those are going to be

20  life-long impacts on those children, seeing what happened.  And

21  you can draw a direct line from the violation of these two

22  federal statutes to that life-long impact on those children.

23          But it stretched further than that to the other

24  children in that school.  One of the letters is from a parent of

25  one of those children.  And it is similar, but different of

1  course, not being in the same room.  But the effects are

2  wide-ranging.  And those are children that are going to grow up

3  in this community.  You know, they're children that are going to

4  be dealing with that for the rest of their lives.  And, you

5  know, it's serious.  There's no other way to say it.

6       The Court is required to impose a sentence that

7  promotes respect for the law and provides a just punishment and

8  one that affords adequate deterrence, both specific deterrence

9  as to Ms. Taylor, and general deterrence as to others who may

10  rely on these forms or use these substances while in possession

11  of firearms.

12       The Court is required to consider a sentence that

13  protects the public and provides the defendant with needed

14  educational treatment.

15       You know, I said earlier that Ms. Taylor should be

16  credited for accepting responsibility and stepping up to the

17  plate, pleading guilty, and admitting that she didn't answer

18  this question truthfully on the form.

19       And the Court considers the context in which all of

20  this happened.  Her mental health conditions.  But the context

21  is more than just the personal mitigating factors.  The context

22  includes the event in April of 2021 in Williamsburg when Ms.

23  Taylor was stopped by the police.  And you know, there was all

24  this marijuana in the car sitting right next to a four-year-old

25  child.  It does not take a lot to imagine what that child had to

1  live with and dealt with and the lack of a stable environment,

2  as much as her grandfather tried to do that for that child.  As

3  he pointed out, he didn't have lawful custody.  There was only

4  so much that he could do.  And that fell to her and to

5  Mr. Ellison as the primary responsible parties for this child.

6            And when you're looking at context you cannot escape

7  the fact that, after that April 2021 event in Williamsburg, you

8  have the U-Haul incident and the other gun, the High Point gun

9  and the shooting of it and the shooting -- whether it was the

10 High Point or this one -- I'm sorry, I may be mixing them up --

11 but the fact is that you had that as an intervening event just

12 within weeks of this incident at Richneck.  And you know, even

13 the defendant says she's not stable.  And then you have this

14 incident, and then you have an inconsistent path since then of

15 efforts to get substance abuse treatment and counseling for the

16 defendant, but continued drug use, continued positive screens,

17 even up to very recently.

18            And so that all forms the context for the

19 consideration of these statutory sentencing factors of the court

20 imposing a sentence that promotes respect for the law and

21 provides a just punishment to the defendant and one that will

22 deter her.

23            And you know, you're not deterred by the stop in

24 Williamsburg in 2021.  You're not deterred by the fact that you

25 had this shooting involving the father of your child.  And

1   apparently the context indicates shooting just above his head.

2   You're not deterred by being on pretrial supervision where

3   you're not to be using unlawful substances.  And it paints a

4   picture of someone who is at least at times willing to accept

5   responsibility and remorseful, but also someone who's either

6   incapable or not willing to, and perhaps a mixture of the two,

7   to control the effects of the substance abuse.

8         And it is true that substance abuse is in many ways an

9   illness and in many ways a choice.  But at some point when

10  treatment and counseling is provided, people have to maintain

11  their own responsibility for their behavior.  And when I think

12  about the challenges for Ms. Taylor of being responsible even

13  while on pretrial supervision and after all of this has

14  happened, it factors into my view of what is needed to protect

15  the public, frankly.  And so I consider that, as well as the

16  need to provide her with needed education or treatment.

17        I'm required to consider the kinds of sentences that

18  are available to me.  And the defense has suggested a sentence

19  of probation and/or home confinement and other options, and I

20  have considered all of that along with all the arguments here.

21        I'm required to consider the sentencing range

22  established under these guidelines which the parties have

23  recommended to me.  And as I said, they know a lot more about

24  the case than I do, and that joint recommendation means much to

25  me.  It requires me to consider any victim of the offense and

1    the role that the defendant played, and whether or not she's

2    engaged in any obstruction or has accepted responsibility.

3           And the need to avoid unwarranted sentence disparities

4    among defendants with similar records who have been found guilty

5    of similar offenses.  And you know, the reason we have

6    sentencing guidelines is so that somebody in California who is

7    standing before a judge for the exact same behavior and somebody

8    standing here before me today don't receive sentences where the

9    same guideline range is not considered.  It's at least a

10   starting point.  And in this case, it is the starting point that

11   the government and the defense have recommended to the Court, an

12   18- to 24-month range.  And I am able to consider that and

13   consider the request for probation and the sentence of 21 months

14   requested by the government alternatively.

15          In asking for a downward variance, the Court of

16   Appeals says I must consider and address out loud here in the

17   courtroom all the non-frivolous arguments for a variance.  We've

18   addressed those identified in the position paper of the defense

19   for the long-term addiction to marijuana; the mental health

20   challenges and diagnoses; the evolving precedents on the

21   constitutionality of 922(g)(3), the crime that's charged in

22   Count 1, that's the unlawful user of controlled substance in

23   possession of a firearm; Ms. Taylor's difficulties during

24   upbringing, becoming a mother at a young age; the strained

25   relationship with Mr. Ellison, being a victim of physical abuse,

1  and her positive attributes in caring for her mother, siblings

2  and son as highlighted in the letters of support that were

3  provided to me.  And I did read those letters, and they do

4  reflect her care for them and her participation with them in

5  helping to raise other family members and being supportive.

6          I'll say this about the one thing there that I had not

7  really addressed to any great extent:  There are some courts --

8  perhaps at least one, and others -- around the country that have

9  found that this Count 1, unlawful user of controlled substance

10 and/or being in possession of a firearm is a violation of the

11 recently elucidated Second Amendment right to possess a firearm

12 as described by the Supreme Court within the last year or so.

13 And that may be -- those are out there.  There has been no

14 opportunity for me to consider or rule upon that, but frankly

15 the sentence would be no different here even if we were only

16 dealing with Count 2.  And so I have fully considered that.

17         Mr. Ellenson, Mr. Rossi, have I addressed all of the

18 non-frivolous arguments for a downward variance?

19         MR. ROSSI:  You have, Your Honor.  Thank you very

20 much.

21         MR. ELLENSON:  Yes, sir.

22         THE COURT:  Okay.  So I'll first say this:  I'm going

23 to impose a sentence of imprisonment.  I'm not going to impose a

24 sentence of probation.  This case cries out for a sentence of

25 imprisonment.  I'm not -- there is just -- there were too many

105

1    opportunities.  There were too many offramps here.  This was not

2    a one-off.  There was a very troubling history leading up to

3    this incident that is a result, in a direct line, from violation

4    of these two laws.

5           Ms. Taylor would not have possessed the firearm while

6    being an unlawful user of controlled substance had she been

7    conforming to federal law, and she would not have possessed the

8    firearm and it be available therefore to her son had she not

9    made the false statement while purchasing the firearm.  And so

10   it's not a one-off.

11          And the situation, the circumstantial evidence about

12   what happened with the U-Haul within weeks of this incident, how

13   easily there could have been a very separate kind of case in the

14   Newport News Circuit Court or wherever that incident happened

15   that were not -- it's not going on right now, but I can't escape

16   all that.  I mean, it is a constellation, it is a perfect

17   constellation of offramp opportunities that were not taken and a

18   dereliction of duty and responsibility in parenting that led to

19   this incident caused by the violation of these offenses.

20          After carefully considering the advisory guideline

21   range and all the statutory sentencing factors, the Court will

22   now impose sentence.

23          You can remain seated.

24          Pursuant to the Sentencing Reform Act of 1984, it is

25   the judgment of the Court that the defendant, Deja Nicole

1   Taylor, is hereby committed to the custody of the United States

2   Bureau of Prisons to be imprisoned for a total term of 21

3   months.  This sentence consists of 21 months on Count 1 and 21

4   months on Count 2, all to be served concurrently.

5          And I'm going say this:  I do think it is a -- it

6   would reflect a proper respect for the individual, separate

7   sovereignty of the State in its prosecution and vindication of

8   State interests for the sentence to be run consecutive to any

9   sentence in Newport News Circuit Court.  That will give the

10  Newport News Circuit Court judge who imposes a sentence the

11  clarity to understand what the sentence is here and then fully

12  consider the impact of that sentence.  And I think that's the

13  proper way to respect that separate sovereignty and the fact

14  that it will be the second court to sentence.

15         Now I am not going to allow self-surrender in the

16  case.  I'm not going to do so because of the continued positive

17  drug screens and the recommendation of the Pretrial Services

18  officer in the case, and I'm going to remand today for service

19  of the sentence.

20         It is my great hope that, during that sentence, Ms.

21  Taylor will be able to receive intensive mental health

22  treatment, and I'm going to recommend mental health treatment.

23         It is my great hope, Ms. Taylor, that you will be able

24  to receive intensive substance abuse treatment, because you have

25  a long-standing substance abuse disorder that has impacted your

1   decision-making ability, has impacted the clarity of your

2   thought, and has clearly impacted your parenting, and you need

3   that treatment before you can return and be able to be involved

4   in the life of your child and your family.  And so I'm going to

5   recommend that you receive that treatment as soon as possible

6   during your period of incarceration.

7            I'll recommend also that you be housed as close to

8   Virginia as possible so that you can have contact with your

9   family.

10           These issues that you have struggled with and that you

11  are struggling with are surmountable, and I see them be overcome

12  by numerous people that have been before me.  And you are very

13  young, and there's no reason in my mind why you should not be

14  able to get the treatment and return to being a productive

15  member of the community.  And you may not think about it, but

16  from my standpoint you are very young, and you have a lot of

17  life ahead of you.

18           Upon release from imprisonment, you shall be placed on

19  supervised release for a term of two years.  This term consists

20  of two years on Count 1 and two years on Count 2, all to run

21  concurrently.  Your supervised release is intensive, and it

22  provides opportunities for further substance abuse treatment and

23  mental health treatment, and I recommend that you be screened

24  for that when your supervised release begins.

25           Within 72 hours of release from custody of the Bureau

1  of Prisons, you shall report in person to the probation office

2  in the district where you are released.

3         You shall refrain from any unlawful use of a

4  controlled substance and you shall submit to one drug test

5  within 15 days of beginning supervised release and at least two

6  periodic drug tests thereafter, as directed by the probation

7  officer.  And if you do test positive, you'll be brought back

8  before me or another judge of the court.  And you need to bear

9  that in mind as you approach your process of treatment.

10         While on supervision, you shall not commit another

11  federal, state or local crime, you shall not unlawfully possess

12  a controlled substance, and you shall not possess a firearm or a

13  destructive device.

14         You shall comply with the standard conditions that

15  have been adopted by this court and are incorporated into this

16  judgment.

17         In addition, you shall obtain a GED or a vocational

18  skill during your period of supervision if you're not employed

19  full-time.

20         If you test positive of a controlled substance or show

21  signs of alcohol abuse, you shall participate in a program

22  approved by the probation office for substance abuse treatment,

23  which program may include residential treatment and testing to

24  determine whether you've reverted to the use of drugs or

25  alcohol, with partial costs to be paid by you, to the extent

1   you're capable, as directed by the probation officer.

2         You shall participate in a program approved by the

3   probation officer for mental health treatment, the costs to be

4   paid by you, to the extent you're capable, as directed by the

5   probation officer.

6         You shall waive all rights of confidentiality

7   regarding substance abuse treatment and mental health treatment

8   to allow the release of information to the probation office so

9   they can communicate, so that if you're having trouble in your

10  treatment, the probation officers can know about that.  The

11  probation officers are going to be there to help you, not hurt

12  you, and they need to know if you're starting to have treatment

13  problems and life problems that they can also help you with to

14  keep you on the straight and narrow road on which you need to

15  be.

16        The Court finds that, having considered your lifestyle

17  and financial needs, your earning potential and the lack of

18  dependents, you're not capable, though, of paying a fine, and

19  the Court will impose a special assessment, however, of $100 for

20  each charge for a total of $200.

21        No restitution has been requested in this case and

22  none is imposed.  No fine is imposed.

23        The special assessment is due in full immediately, any

24  balance to be paid at fifty dollars a month until paid in full,

25  beginning 60 days after supervision starts, and the special

1    assessment is subject to penalties for default and delinquency.

2              Nothing in my order prohibits the collection of any

3    judgment or fine by the United States.

4              Payment of the penalties is due during the period of

5    imprisonment and may be paid through the Bureau of Prisons.

6              You shall notify the U.S. Attorney for this district

7    within 30 days of any change of name, residence or mailing

8    address until all of the costs and special assessments are paid

9    in full.

10             Now, as part of your plea agreement you waived your

11   right to appeal.  Generally, waivers of appeal are enforceable.

12   However, if you believe that your waiver is unenforceable, or if

13   you believe there's an appealable issue that falls outside of

14   your waiver, then you may present that issue to the U.S. Court

15   of Appeals.  To do that, you must file a notice of appeal within

16   14 days from the entry of judgment.  If you do not file the

17   notice of appeal on time, you may lose your right to appeal.

18             You have the right to be assisted by an attorney on

19   appeal.  One will be appointed for you by the Court if you

20   cannot afford to hire an attorney.  You may be permitted to file

21   the appeal without payment of the costs if you make a written

22   request to do so.  Also, if you make a request of the clerk's

23   office, someone there will prepare and file the notice of appeal

24   for you.

25             I have said to you that I believe with these

1  wrap-around services that we've been talking about, that you can

2  surmount this and return to be a productive member of the

3  community.  And I want to encourage you in that, Ms. Taylor.

4        It would be remiss of me also not to address A.Z. and

5  all of those children in particular that were impacted by this.

6  And they were moving statements that I heard and that I read and

7  it is as sad as it can be that these harms, these impacts, these

8  wrongs, were done.  But I've been on the bench for 20 years, and

9  I've seen a lot of people who have gone through very challenging

10  circumstances and who, early on after those incidents, felt that

11  they were going to have great difficulties.  And I've seen so

12  many of them heal and receive the treatment that they need and

13  go on to lead very productive and healed lives.  And that is my

14  sincere hope for you, and for all of those children that were

15  impacted.

16        Mr. Osyf, is there anything else that we need to

17  address?

18        MR. OSYF:  No, Your Honor.  There was a consent order

19  of forfeiture submitted during the guilty plea.  So that has

20  already --

21        THE COURT:  That's been entered already?

22        MR. OSYF:  Yes, Your Honor.

23        THE COURT:  Madam Clerk, does that need to be

24  incorporated into the judgment?

25        COURTROOM DEPUTY CLERK:  Yes, sir.

1          THE COURT:  All right.  That will be incorporated into

2    the judgment.

3          (Counsel conferred.)

4          THE COURT:  Anything else you all want to address?

5          MR. ELLENSON:  No, sir.  I can get with Ms. McKeel and

6    we'll work out -- about a writ getting over to state court,

7    but --

8          THE COURT:  All right.  Very good.

9          MR. ELLENSON:  -- she'll work that out with me, Judge.

10   Thank you, sir.

11         THE COURT:  Very good.

12         The only other thing I'll say, Mr. Rossi, then I'll

13   hear from you, is I do recognize that the consecutive sentence

14   is a variance from the guideline --

15         MR. ROSSI:  Yes, Your Honor.

16         THE COURT:  -- range, but the respect for sovereignty

17   of the State, I think, mandates it, as well as just respect for

18   the fact that there is another judge who is going to impose a

19   sentence after me.  And I want him or her to have the full

20   panoply of options available to them in that decision-making

21   process, and I think it's due respect to them to proceed in that

22   fashion, notwithstanding the fact that it is a variance from the

23   guidelines.

24         MR. ROSSI:  Your Honor, thank you.  Thank you.

25         THE COURT:  All right.  Thank you all.

1          Ms. Taylor, I wish you well.

2          (Whereupon, proceedings concluded at 4:28 p.m.)

3                          –  –  –

4                      *CERTIFICATION*

5

6          *I certify that the foregoing is a true, complete and*

7  *correct transcript of the proceedings held in the above-entitled*

8  *matter.*

9          Paul L. McManus   Digitally signed by Paul L. McManus
                             DN: cn=Paul L. McManus, c=US,
                             email=pmcmanusocr@gmail.com
10         _____   Date: 2023.11.27 15:18:21 -05'00'

11              Paul L. McManus, RMR, FCRR

12                  _____

13                      Date

14

15

16

17

18

19

20

21

22

23

24

25

Paul L. McManus, RMR, FCRR Official Court Reporter